[No. H036865. Sixth Dist. Jan. 15, 2013.]

HERIBERTO CEJA RODRIGUEZ, Plaintiff and Appellant, v. TAKESHI OTO et al., Defendants and Respondents.

COUNSEL

Anthony R. Lopez & Associates, Mark S. Levine; Southwest Legal Group and Anthony R. Lopez, Jr., for Plaintiff and Appellant.

Joseph Costella & Associates, Stephen J. Schori and Steven R. Myers for Defendants and Respondents.

OPINION

**RUSHING, P. J.**—We address in this case the question of how much evidence a defendant must present to establish a right to summary judgment under a global release by the plaintiff of "all persons" exposed to liability for his personal injuries. Plaintiff contends that the trial court here erred by granting summary judgment because defendant relied solely upon the language of the release. According to plaintiff, a defendant in such a case must present additional evidence, extrinsic to the written agreement, of the parties' "actual intent to benefit the third party." We have concluded that insofar as some language in the cases might appear to support such a rule, it arises from, and should be confined to, the distinct issue whether a stranger to a contract, who stands to benefit from its performance, is an "incidental" beneficiary, rather than an "intended" one entitled to enforce its terms. In that context, extrinsic evidence is commonly necessary to ascertain the intended effect of the contract on the third party. It nonetheless remains the rule that where a clear intent can be ascertained from the parties' written agreement, that agreement is at least prima facie evidence of their "actual intent." Thus where its language unambiguously expresses a mutual intent to benefit a class of third persons, a member of that class makes a prima facie case of entitlement to its enforcement by proving the agreement—unless some cause to go outside the terms of the instrument, such as fraud, mistake, or latent ambiguity, appears. Here the only potentially sufficient cause suggested by the record is the mere possibility, raised belatedly by plaintiff, that a claims adjuster involved in negotiating the settlement might provide evidence that plaintiff did not expect the release to sweep as broadly as its language indicated. We find no abuse of discretion in the trial court's denial of plaintiff's tardy request for a continuance to explore that possibility. Accordingly, we will affirm the judgment.

## BACKGROUND

On March 22, 2007, a vehicle operated by defendant Takeshi Oto collided with a vehicle operated by plaintiff Heriberto Ceja Rodriguez. Unbeknownst to plaintiff, Oto was driving from an event related to his employment with a

subsidiary of Toshiba America, Inc. (Toshiba).[1] While he himself had rented his vehicle from The Hertz Corporation (Hertz), Toshiba ultimately reimbursed him for the rental. Moreover, the rental was governed by an agreement between Hertz and Toshiba setting forth terms on which employees of the latter would rent vehicles on company business. That agreement included a "liability protection override" obligating Hertz to "provide primary protection . . . for bodily injury or death up to a limit of $25,000 for each person" and to "indemnify, hold harmless, and defend [Toshiba] employee renters . . . and fellow employees who operate the car incidental to their business duties."

Plaintiff engaged counsel the day after the accident. Some seven months later, he settled with Hertz for $25,000, the limit of its coverage for bodily injury or death. As part of the settlement he executed a written release in favor of "Takeshi Oto and The Hertz Corporation, its employees, agents, servants, successors, heirs, executors, administrators and *all other* persons, firms, *corporations*, associations or partnerships (hereafter Releasees)."[2] (Italics added.) He testified that "some person from my lawyer's" explained the release to him when he signed it. He answered "Yes" to the question whether he "underst[oo]d what [he] was signing at the time that [he] signed it." However, he answered "No" when asked whether, in signing the release, he

---

[1] The parties attribute no legal significance to the separate corporate personality of Oto's employer, and often refer to the two entities indiscriminately as "Toshiba." We will do likewise.

[2] The release stated, in pertinent part, "That the Undersigned, being of lawful age, for the sole consideration of **Twenty Five Thousand Dollars** 00/100 ($25,000.00) to the undersigned in hand paid, receipt whereof is hereby acknowledged, do hereby and for my heirs, executors, administrators, successors and assigns release, quit and forever discharge Takeshi Oto and The Hertz Corporation, its employees, agents, servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships (hereafter Releasees) of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned has or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and proper [*sic*] damages and the consequences thereof resulting or to result from the unknown, foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 21st day of March, 2007 at or near Sunnyvale, CA.

"In consideration of this above sum, the undersigned further agrees to release The Hertz Corporation, it [*sic*] agents, servants, employees, and all Releasees above named, from any and all further causes of action as they may relate or pertain to the above entitled claim, including but not limited to costs and expenses incurred by the undersigned in pursuit of this claim, said costs and expenses which the undersigned expressly agrees to satisfy and pay."

The release also contained an express waiver of the protection of Civil Code section 1542, which provides that a general release does not extend to claims which the releaser "does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

thought he was "releasing others besides Mr. Oto and Hertz from responsibility." Nor did he believe he was "releasing Mr. Oto's employer from responsibility" for the accident.

On February 18, 2009, plaintiff filed this action against Oto and "Toshiba America," alleging that Oto injured plaintiff through negligent operation of a vehicle, and that defendants, "and each of them," negligently "owned, operated, used, drove, maintained, loaned and/or entrusted their motor vehicle," so as to cause his injuries. Defendants answered the complaint, asserting the release as an affirmative defense. On September 13, 2010, they moved for summary judgment on this basis. Plaintiff opposed the motion on the merits but also requested a continuance to conduct discovery. The trial court granted summary judgment, finding that the undisputed evidence established that the release explicitly exonerated Oto from further liability and that it also extended to Toshiba. The court found plaintiff's undisclosed intentions insufficient to raise a triable issue of fact, and that the extrinsic evidence established no ambiguity. The court denied plaintiff's request for a continuance, ruling that he had failed to show that such a continuance would enable him to discover facts essential to opposing the motion. The court duly entered judgment, and plaintiff brought this timely appeal.

## I. Summary Judgment

### A. Standard of Review

A summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c (section 437c), subd. (c).) A defendant seeking summary judgment meets his burden by showing that an element of the plaintiff's cause of action cannot be established or that a complete defense to the cause of action exists and cannot be successfully contested by the plaintiff. "Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or . . . defense . . . ." (§ 437c, subd. (p)(2).) "In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court . . . ." (§ 437c, subd. (c).) Because the existence of a triable issue of fact is itself a question of law, we review without deference a ruling by the trial court that the evidence presented on summary judgment raised no such issue. (See *Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1217 [18 Cal.Rptr.3d 276].)

Defendants' showing in support of summary judgment consisted basically of the undisputed fact that plaintiff signed the release, coupled with the

absence of any apparent ground to contest its general validity. In opposition, plaintiff asserted four principal facts: (1) That Toshiba and Hertz had entered into a corporate rental agreement under which Oto had rented the car he was driving when he collided with plaintiff; (2) that the release did not name Toshiba as a releasee; (3) that none of the participants made any "express reference" to Toshiba in connection with the settlement; and (4) that "[a]t the time of drafting the Release, it was not the intention of either HERTZ, OTO, or the Plaintiff to release TOSHIBA from liability" for the underlying accident.

In support of the third fact, plaintiff offered two letters from his counsel to Hertz Claims Management dated May 10, 2007, and October 15, 2007, and one letter from Don Beierschmitt of Hertz Claims Management to plaintiff's counsel dated November 2, 2007, reflecting a policy limit demand of $25,000, and a settlement in that amount. To establish the fourth fact, plaintiff simply cited his own deposition statement that he did not believe he was releasing Oto's employer from liability when he signed the release.

### B. *Claim Against Oto*

A release is an instrument by which the signing party (releasor) relinquishes claims or potential claims against one or more persons (releasees) who might otherwise be subject to liability to him. The existence of a valid release is a complete defense to a tort action against the releasee. (E.g., *Donnelly v. Ayer* (1986) 183 Cal.App.3d 978, 983 [228 Cal.Rptr. 764] [legal malpractice].) In this case, the release specifically named defendant Oto as a releasee. The sole rationale plaintiff has offered for denying effect to the release, as it affects Oto, appears in a footnote in his opposition memorandum, where it is stated that Oto was joined "as a matter of caution since he may very well be a 'necessary party[']. . . ." Plaintiff does not pursue this rationale in this court, or offer any other basis for denying effect to the release as it affects Oto. Accordingly, the judgment in his favor must be affirmed.

### C. *Claim Against Toshiba*

The real point of controversy below and here is the effect of the release on plaintiff's claims against Toshiba, which for purposes of this appeal may be deemed Oto's employer (see fn. 1, *ante*). In the context of summary judgment, this question raises two subsidiary inquiries: (1) Was the evidence in support of the motion sufficient to constitute a prima facie showing, without factual controversy, that the release was effective to preclude a judgment against Toshiba? (2) If so, did plaintiff present evidence raising a triable issue of fact on that point, or establish his entitlement to a continuance to secure such evidence?

The release signed by plaintiff extended not only to the named releasees Hertz and Oto, and their agents and successors, but to "all other persons, firms, corporations, associations or partnerships." As a matter of plain logic, Toshiba—along with every other person or corporation in the universe—belongs to the class thus absolved of liability. The question is whether this logic alone is enough to establish, in the absence of countervailing evidence, that Toshiba is entitled to the protection of the release. We are confident that under the circumstances shown here, this question warrants an affirmative answer.

Plaintiff contends that a third party who is not named in a release, but who seeks to bring himself within its terms, bears the burden of showing that the lease applies to him—and, moreover, that "[t]his burden is ordinarily not met by simply relying on a literal interpretation of the contract." (Italics omitted.) In addition, he asserts, a third party must present "evidence of the contracting parties' *actual intent* to benefit the third party." (Original italics.) Later he asserts that Toshiba failed to carry this burden because it presented no "testimony or other extrinsic evidence that would support the issue of the *intention* of the parties who actually made out the release." We do not find this approach consistent with the governing principles of contract law; nor do we believe it is sustained by the authorities plaintiff cites.

■ A contract is "an agreement to do or not to do a certain thing." (Civ. Code, § 1549.) As such it requires mutual assent. (Civ. Code, § 1565, subd. 2.) It is fundamental, however, that "there need not be a subjective meeting of the minds; in the absence of fraud, mistake, etc. . . . , the outward *manifestation* or *expression* of consent is controlling. In other words, *mutual consent is gathered from the reasonable meaning of the words and acts of the parties*, and not from their unexpressed intentions or understanding." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 116, p. 155, citation omitted, some italics added; see Civ. Code, § 1565, subd. 3 [contract requires consent "[c]ommunicated" by each party "to the other"].) In the absence of fraud, mistake, or another vitiating factor, a signature on a written contract is an objective manifestation of assent to the terms set forth there. (See *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587 [36 Cal.Rptr.3d 901].) If the terms are unambiguous, there is ordinarily no occasion for additional evidence of the parties' subjective intent. (*Ibid.*) Their "actual intent," for purposes of contract law, is that to which they manifested assent by executing the agreement.

■ It is true that in determining the meaning of a contract, the dominant objective is to "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) But in ascertaining the parties' mutual intention, their agreed

language "is to govern . . . if the language is clear and explicit, and does not involve an absurdity." (*Id.*, § 1638.) When the contract has been "reduced to writing," the parties' intention "is to be ascertained from the writing alone, if possible," subject to other rules of interpretation. (*Id.*, § 1639.)

■ There are of course many exceptions and qualifications to these principles. But the principles do not become inoperative merely because the contract is invoked by someone who was not a party to it. The question in such a case is whether the parties intended to confer enforceable rights on the party now asserting them. The governing substantive principle is that a nonparty who claims benefits under the contract is entitled to do so as long as the claimed benefit does not flow to him as a mere *incident* of the agreement, but is one the contracting parties *intended* to confer. (Rest.2d Contracts, § 302; see Civ. Code, § 1559 [contract "made expressly for the benefit" of third person "may be enforced by him at any time before the parties thereto rescind it"]; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1022 [90 Cal.Rptr.3d 453], quoting *Gilbert Financial Corp. v. Steelform Contracting Co.* (1978) 82 Cal.App.3d 65, 70 [145 Cal.Rptr. 448] [" 'As used in Civil Code section 1559, the 'word "expressly . . ." ' . . . has now come to mean merely the negative of "incidentally." ' "].)

■ The rights of a third party beneficiary thus depend upon the intent of the contracting parties. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46] (*Hess*).) "Ascertaining this intent is a question of ordinary contract interpretation." (*Ibid.*) It follows that if the requisite intent appears unambiguous from the face of the contract, the third party makes a prima facie showing of entitlement merely by proving the contract. This is what Toshiba did here. Under ordinary principles of contract law, this satisfied both its substantive burden as a third party beneficiary and its procedural burden as the moving party asserting an affirmative defense on summary judgment.

Plaintiff's contention to the contrary is traceable to judicial pronouncements which we believe have little proper bearing on language like that here, which unambiguously grants legal rights to one or more third parties. In a case of this kind, the contract either grants an *intentional* benefit to the person asserting rights under it, or it affords him no benefit at all. The language on which plaintiff's argument depends arose in, and should be largely confined to, cases where performance of the contract may benefit the third party but leaves open the question whether this is an intended object of the agreement, such that recognition of enforceable rights in the third party is necessary to carry out the contracting parties' intentions—or is merely incidental thereto, i.e., a collateral and inessential consequence of the transaction contemplated

by the parties. Plaintiff's argument, and to some extent the authorities on which it rests, conflate these quite distinct situations.

Plaintiff's chief authority is *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337 [87 Cal.Rptr.2d 856] (*Neverkovec*). That case arose from a two-car accident in which the insurer for the first car's owner agreed to pay its policy limits, apportioned in agreed amounts among four other persons involved in the accident. The appeal arose from a suit against the second driver by the most grievously injured of the passengers. He had signed a "particularly broad" release, extending to the first driver's insurer, three named individuals, and " 'any other person, firm or corporation charged or chargeable with responsibility or liability.' " (*Id.* at p. 342.) The trial court entered summary judgment for the second driver on the ground that the release excused him from liability.

The Court of Appeal reversed. It acknowledged that "[r]elease agreements are governed by the generally applicable law of contracts." (*Neverkovec, supra*, 74 Cal.App.4th at p. 348.) It noted, however, that third parties are not empowered to " 'enforce covenants made not for [their] benefit,' " and that a third party's right to enforce performance " 'is predicated on the contracting parties' intent to benefit him.' " (*Ibid.*, quoting *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584].) It then made the pronouncements cited here by plaintiff: *"The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.* The contracting parties must have intended to confer a benefit on the third party. [Citations.] [¶] It is not necessary for the third party to be specifically named in the contract, but such a party bears the burden of proving that the promise he seeks to enforce was actually made to him personally or to a class of which he is a member.[3] [Citations.] In making that determination, the court must read the contract as a whole in light of the circumstances under which it was entered. [Citations.] [¶] Thus, to obtain summary judgment on the ground that a general release has discharged him from liability, a third party to the release agreement must affirmatively show that the parties intended to release him. The burden of proof is on the third party, under both contract law and the summary judgment statute. (§ 437c, subd. (*o*).) *Because the court must consider the circumstances of the contracting parties' negotiations to determine whether a*

---

[3] The suggestion that the promise must be made "to" the releasee is perplexing. We are aware of no such requirement, and can conceive of no reason for it. The authorities sometimes speak of promises made *for* the releasee, which is a far more accurate description of the situation generally contemplated by the law of third party beneficiaries. (*Murphy v. Allstate Ins. Co., supra*, 17 Cal.3d 937, 943 [third party "may enforce those promises directly made for him"]; *Harper v. Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1087 [66 Cal.Rptr.2d 64] [same]; see Civ. Code, § 1559 [third party may enforce contract "made expressly for [his] benefit"].)

*third party not named in the release was an intended beneficiary, it will seldom be sufficient for the third party simply to rely on a literal application of the terms of the release.* 'The fact that . . . the contract, if carried out to its terms, would inure to the third party's benefit[,] is insufficient to entitle him or her to demand enforcement.' [Citation.] 'However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.' (Civ. Code, § 1648.) 'Whether a third party is an intended beneficiary . . . to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered.' [Citation.]" (*Neverkovec, supra*, at pp. 348–349, fn. omitted, italics added.)

We have no doubt that for a contract to confer rights on a third party, the contracting parties must intend it to do so. Beyond that we have grave reservations about the reliability of the above passage as a statement of the law applicable to a case where, as here, the contract expresses unambiguously an intent to confer rights on a class of persons including the third party asserting rights under the contract. The gravamen of the passage appears to be that even where the contract plainly expresses an intent to grant rights to the party claiming them, he can only establish those rights by presenting extrinsic evidence sufficient to show that the parties really meant what they said. Such an approach flies in the face of "the generally applicable law of contracts" (*Neverkovec, supra*, 74 Cal.App.4th at p. 348)—which, as we have said, determines the parties' intent in the first instance from what they said, and moves on to other evidence only if some recognized ground is shown to do so, such as ambiguity, fraud, mistake, or unconscionability.

For that reason we cannot subscribe to several other premises emanating from the above passage, as applied to an instrument such as the release before us. Thus we do not accept it as a general rule that, in a case such as this one, the rights of a third party cannot be determined without "consider[ing] the circumstances of the contracting parties' negotiations." (*Neverkovec, supra*, 74 Cal.App.4th at p. 349). That proposition too flies in the face of the basic principles of contract law we have already described. Again, the cases cited for it involved agreements that were silent or facially ambiguous with respect to the rights of third parties. The courts were discussing problems of proof on the pivotal question whether an agreement was intended to confer enforceable benefits on the third party or whether the benefit to him, if any, was incidental to the agreement.[4]

---

[4] The cases cited in the relevant segment of *Neverkovec* are *Murphy v. Allstate Ins. Co., supra*, 17 Cal.3d 937, 944 (action by wrongful death claimant against tortfeasor's insurer; third party not entitled to enforce covenants made for benefit of others in absence of intent to benefit him); *Harper v. Wausau Ins. Co., supra*, 56 Cal.App.4th 1079, 1087 (quoting *Murphy*); *Bancomer, S. A. v. Superior Court* (1996) 44 Cal.App.4th 1450, 1458 [52 Cal.Rptr.2d 435]

■ The very essence of a release is to grant legally enforceable rights, in the form of an immunity or excuse from suit. Insofar as the release extends its benefits to third parties, there can be no question of their being denied enforcement on grounds that they are incidental. The nature of the benefit conferred cannot be an issue. Any benefit conferred by the release is either intentional, or nonexistent. The only question is to whom those rights are granted, and specifically, whether the party now asserting them is among them. Cases where a contract is silent or ambiguous with respect to the rights of third parties are wholly inapposite, and statements of law appearing in them cannot be uncritically imported into the present context without doing serious violence to the basic principles noted above—and sowing confusion and uncertainty among those dependent on those principles to guide their affairs.

Nor can we endorse the corollary of the above premise, that a third party belonging to a class unambiguously exonerated by a release cannot ordinarily carry its prima facie burden of establishing standing under the release by relying solely on the language of the release. If a contract expressly and unambiguously grants rights to a class including the person now seeking to enforce it, proof of the contract makes out the third party's threshold case. It is of course competent for the party opposing enforcement to establish grounds to avoid the apparent effect of the agreement. But there is no general burden on the person invoking the agreement to find a way to prove, as plaintiff insists, an "*actual intent* to benefit the third party." (Original italics.) The agreement itself is such proof.

■ We recognize that to grant literal enforcement to a global "all persons" clause may raise questions concerning the fair and efficient allocation of social costs and the economical use of judicial resources. In the typical scenario, an injured claimant, often represented by counsel, negotiates

---

(bank named as trustee in Mexican real estate sale contracts was incidental beneficiary, not entitled to enforce forum selection clause); *Kalmanovitz v. Bitting* (1996) 43 Cal.App.4th 311, 316 [50 Cal.Rptr.2d 332] (legatees named in codicil later revoked, had no rights under preceding will agreement not referring to them); and *Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1725 [33 Cal.Rptr.2d 291] (fact that insurance payments would have benefited tenant under rent abatement provision of lease was incidental to insurance policy; "Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered.")

Indeed the *Harper* case, among others, contains language at odds with, if not contradictory to, the approach espoused in *Neverkovec*: "A third party may qualify as a beneficiary under a contract where the contracting parties must have intended to benefit that individual and such intent appears on the terms of the agreement." (*Harper, supra*, 56 Cal.App.4th at p. 1087; see *ibid.*, quoting *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031, 1042 [143 Cal.Rptr. 415] ["as one of a class for whose benefit the policy was expressly made," permissive driver "was an express third party beneficiary. . . . A third party beneficiary may, of course, enforce a contract expressly made for his benefit." (citations omitted)].)

a settlement with an insurance adjuster. It is usually understood that the claimant will, in exchange for the agreed payment, release any known tortfeasor or other potential defendant (or cross-defendant) arguably covered by the settling insurer. The insurer may also be expected to seek the release of other persons, or categories of persons, whose potential liability might ultimately flow back to it. But the precise terms of the release may not be discussed at all. Often they are only seen by the claimant when the release arrives at counsel's office along with a check, negotiation of which is conditioned on the claimant's execution of the release. This is the critical moment at which the claimant or counsel ought to study the language of the release carefully to ascertain whether it may impair claims the plaintiff should reserve for further prosecution. Diligent counsel, we trust, undertake this examination and advise the client accordingly. But not all claimants are represented by counsel, and not all attorneys are diligent enough to invest the necessary time and effort parsing the release.[5] The temptation not to do so must be particularly acute when questions about its terms may jeopardize the settlement that has already been negotiated. The path of least resistance is to simply sign. By doing so, as we have said, the claimant objectively manifests his assent to the terms of the release. But enforcing those terms literally may mean that the plaintiff has given up rights he did not really mean to give up, which can yield several unfortunate consequences: A stranger to the release may receive a windfall, i.e., an excuse from liability the law would otherwise require him to bear; the plaintiff may be deprived of a recovery to which he would otherwise be entitled, and which is necessary to make him whole; and this loss in turn may force the plaintiff to pursue—and the courts to entertain—the less certain and more burdensome remedy of a malpractice action against the attorney.

These possible consequences do not by themselves provide this court with grounds to deny effect to the plain language of the release before us. But they may suggest policy concerns deserving the attention of the Legislature

---

[5] Parsing is indeed often necessary, since ascertaining the scope of a release may require reading and analytical skills far exceeding those of the ordinary layperson, and perhaps even some lawyers. The "all other persons" clause in the present release appears about 60 words into a sentence of some 175 words. Online reading comprehension calculators corroborate our impression that its reading comprehension level is virtually off the charts. Its intelligibility is constrained further by the 14 words ahead of it, naming two specific releasees and describing several more specific classes of releasees. All of this language is rendered logically superfluous by the "all other persons" clause. If *all* persons are released, a release of specific ones is redundant. Further redundancy appears in the following paragraph, which appears simply to repeat the substance of the preceding paragraph, but without the "all other persons" clause.

The release is, in short, a classic example of that arcane language, virtually foreign to most citizens, known as legalese. One possible solution to the problems raised by these cases is a rule predicating enforcement of personal injury releases on their comprehensibility to persons of ordinary understanding.

or a higher tribunal. They also explain the judicial reluctance, reflected in *Neverkovec* and other decisions, to grant uncritical literal effect to a global "all persons" clause when there is *any* evidence of a manifested intent to reserve rights against a stranger to the release. The court in *Neverkovec, supra,* 74 Cal.App.4th at page 352, appeared to find the release there ambiguous on its face, since after purporting to exonerate everyone in the universe from liability, it called for the releasing party to " 'repay' any additional amounts that anyone chargeable with liability for [the releasor's] injury might be compelled to pay in the future." (*Id.* at p. 352.) This provision was inconsistent with a truly global release, which would preclude any such future payment. Further, the court wrote, "even if the broad language of the release were deemed sufficient to shift the burden of proof in the summary judgment proceeding to [the plaintiff], the circumstances surrounding the release agreement disclose a triable issue regarding the parties' intent to foreclose any claim against [the defendant]." (*Ibid.*) These circumstances included the fact that the underlying settlement agreement contemplated only the release of one of several known potential defendants, and that some of the settling parties brought a motion under Code of Civil Procedure section 877.6 to determine the good faith of their settlement—a procedure whose purpose is to exempt the settling parties from further liability to cotortfeasors, an exemption which would be superfluous if the parties' releases had precluded any further litigation. Indeed one of the settling parties had filed suit against the person now asserting the release one day before he himself had signed a release.

In *Appleton v. Waessil* (1994) 27 Cal.App.4th 551 [32 Cal.Rptr.2d 676], the plaintiff settled with the owner of a vehicle involved in an accident and then brought suit against the driver of the vehicle. The driver obtained summary judgment based on an "all other persons" clause in the release obtained by the settling party. The Court of Appeal reversed. The plaintiff had offered extrinsic evidence including "an unchallenged declaration of [his] counsel that at all times [counsel for the settling party] was advised that [the plaintiff] would be pursuing the action against [the other driver]." (*Id.* at p. 555.) This evidence was sufficient to show a latent ambiguity in the release as potentially applicable to the other driver. The admissibility of such evidence, the court observed, does not depend on whether " 'the language appears to the court to be unambiguous,' " but on whether " 'the evidence presented is relevant to prove a meaning to which the language is "reasonably susceptible." ' " (*Ibid.,* quoting *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) The evidence and circumstances raised a triable issue whether the "all other persons" clause *was intended to encompass the other* driver, who was "not just a peripheral actor" in the accident, but its chief cause. (*Id.* at p. 555.) He was also a named defendant in the underlying lawsuit, such that his very omission from the release raised an ambiguity. *(Id.*

at pp. 555–556.) The extrinsic evidence, thus properly admitted, supported a finding of manifest intent not to release the driver.

Perhaps most instructive of the cases in this area is the Supreme Court's decision in *Hess, supra,* 27 Cal.4th 516. The plaintiff there had been a passenger in a pickup that rolled over after being struck by another vehicle. Prior to suit, the plaintiff settled with the other driver and his insurance company, signing a "one-page boilerplate release form" in exchange for the driver's $15,000 policy limits. (*Id.* at p. 521.) The release included an "all other persons" clause substantially identical to the one here. The plaintiff then brought suit against the manufacturer of the pickup truck, which asserted the release as grounds for summary judgment. The court granted the motion, but the plaintiff obtained a judgment reforming the lease in a separate action, and an order denying his motion for new trial in the tort action was reversed on appeal. At the ensuing trial, the court received testimony that the plaintiff's original attorney, who negotiated the settlement with the other driver, intended at all times to bring suit against the manufacturer; that he discussed that intention with the claims adjuster; and that the adjuster understood the plaintiff would not have entered into the agreement if it had operated to release the manufacturer. Moreover, the adjuster testified, he himself had not intended to release the manufacturer, but had only intended to protect the insurer and its insured from " 'future exposure.' " (*Id.* at p. 522.)

After the Court of Appeal affirmed a judgment for the plaintiff, the Supreme Court granted review to consider, as pertinent here, "whether . . . language in an agreement releasing 'all other persons, firms, corporations, associations or partnerships' from liability encompasses a tortfeasor who was not a party to the settlement negotiations." (*Hess, supra,* 27 Cal.4th at p. 523.) All members of the court agreed that the judgment should be affirmed. The majority, however, based its decision on the doctrine of mutual mistake—which, it noted, was the plaintiff's "only defense to Ford's claim of third party beneficiary status." (*Id.* at p. 525.) The uncontroverted evidence bore out the plaintiff's theory, and nothing from the manufacturer raised an issue for the jury. Accordingly the trial court did not err in taking the issue from the jury, whether or not that result was dictated by the judgment in the reformation action.

Here plaintiff offered no evidence other than his own subjective intent, and even that evidence was strikingly vague at best. He cited only his own deposition testimony to support the assertion that "it was not the intention of either Hertz, Oto, or [himself] to release Toshiba from liability." His testimony, however, consisted of negative answers to the questions, "Did you think you were, when you signed [the release], releasing others besides Mr. Oto and Hertz from responsibility?" and "When you signed [the release],

do you believe you were releasing Mr. Oto's employer from responsibility for your accident?" His response to the first question merely establishes an understanding *flatly contrary* to the language of the release, which unmistakably released "others besides" the named releasees, whether or not it released Toshiba. The second question is stated in the present tense, turning it into an inquiry not about the witness's understanding at the time of execution but his *opinion* at the time the testimony is given. Moreover he went on to confirm that he could have had no specific intention with respect to Toshiba, or Oto's employer, because he "didn't even know that Mr. Oto was working for someone at the time of the accident." This contrasts sharply with the facts in *Hess*, where the plaintiff's attorney had specifically informed the insurance adjuster of his intention to proceed against the manufacturer, and *Neverkovec*, where one of the claimants had filed suit against the other car's driver the day before signing a release with an "all persons" clause. Plaintiff asserts Hertz's failure to expressly include Toshiba among the released parties as evidence of an intent that the release not extend to it. But we see no evidence that Hertz's adjuster had any reason more than plaintiff did to think that Toshiba was a potential defendant.

If anything, Toshiba's omission from the release suggests that the adjuster himself was unaware of the facts potentially exposing Toshiba to liability, i.e., that Oto was driving from a company function when the accident occurred. In contrast to the adjuster in *Hess*, Hertz's adjuster at least arguably had a reason to ensure that the release extended to the third party, namely that the coverage afforded to Oto had in effect been purchased by Toshiba under the blanket rental agreement between Toshiba and Hertz. Had Toshiba thereafter been exposed to liability to plaintiff, it might have taken the position that Hertz had breached a duty to Toshiba by failing to secure its release. Therefore, had the subject of Toshiba's potential liability come up in the settlement negotiations, Hertz might well have refused to settle without an explicit release of Toshiba. This of course is speculation, but that is all the present record permits. Neither the failure to name Toshiba in the release, nor plaintiff's deposition testimony about his subjective understanding of its effect, was sufficient to raise a triable issue of fact concerning the mutual intention of the parties. So far as this record shows, that intention was fully and accurately expressed by the language of the release.

II. *Failure to Grant Continuance*

A. *Background*

The motion for summary judgment was filed on or about September 13, 2010, with a hearing date of January 20, 2011. In a declaration filed in opposition to the motion on about January 5, 2011, counsel for plaintiff stated

that in June or July of 2010, after a court-ordered arbitration hearing, he had discussed the circumstances of the release "in light of the arguments [defense counsel] had made at Arbitration concerning the nature and scope of the Release" agreement. Defense counsel told him that according to "representatives of HERTZ," the adjuster responsible for the release, one Don Beierschmitt, "was no longer with that business." Defense counsel also "indicated that the HERTZ representatives had not been terribly helpful or forthcoming regarding the circumstances surrounding the subject Release." Based on this information "as well as the arguments made in the pending Motion for Summary Judgment," counsel issued a deposition subpoena "on or about November 24, 2010," in order to determine defendants' "interpretation of the subject [*sic*] as well as the whereabouts of Don Beierschmitt." Around December 15, counsel received written objections to the subpoena. About five days later, he discussed the objections with their author, who told him that he stood by the objections and that "he was not 'aware' of anyone who could explain how the subject Release was drafted or the intent behind the Release vi[s]-a-vis Toyota [*sic*; Toshiba]." Plaintiff's counsel declared that he intended to file a motion to compel, but that "owing to the press of business," he "anticipate[d]" its filing "no later than January 15, 2011." There is no indication that any motion to compel was ever filed.

On January 20, at the hearing on the motion for summary judgment, counsel for plaintiff told the court that Beierschmitt had been located "last night."[6] Counsel explained that after unsuccessful attempts to learn Beierschmitt's address from Hertz, "we went off on our own to try to attempt to find" him, repeating, "We found him last night." In response to the court's inquiry, counsel confirmed that he was asking for a continuance "so that we can get Mr. [Beierschmitt]'s testimony." The court alluded to a statutory requirement "that you identify the evidence and say what it's going to be," to which counsel replied that Beierschmitt would "testify as to the circumstances surrounding the creation of the release, and the intent behind both parties." Asked what the witness would say "that would be material to the disposition of this motion," he replied, "That the failure to include Toshiba was intentional and knowledgeable. That's the primary issue." Defense counsel asserted that "it seems to be purely speculative that [Beierschmitt] is going to say one thing or another." He also observed that plaintiff had supplied "no real explanation for why . . . they didn't find him before."

The court then asked plaintiff's counsel, "[A]re you representing that you know what this individual would testify to and that he would testify that Hertz intended to exclude Toshiba?" Counsel replied that he could not "make that representation." He asserted that he had "contacted" Beierschmitt, but

---

[6] The adjuster's name appears throughout the reporter's transcript as "John Byer Smith" but we are confident this is a mistranscription of "Don Beierschmitt."

only to "confirm his identity as a former Hertz claims manager." "[A]s a manner of propriety," he continued, "because [Beierschmitt] was a Hertz claims manager, and in that capacity represented Mr. Oto and Hertz, it would have been grossly improper for me to start making inquiries directly . . . without the representation and consultation of counsel . . . ." The court asked "why, given the length of the notice period, this happened all of a sudden last night," to which counsel replied that he had encountered "a virtual stonewall of objections" when he tried to "get a representative of Hertz Claims Management through the deposition process." It then became "incumbent upon us to move on our own especially since [Beierschmitt] is no longer with the company and he is the most relevant person to offer testimony." He was the most relevant person, counsel explained, "[b]ecause he was the person that was doing the bargaining with our individuals within our office. He was the claims manager on this case."

Based on this last remark, defense counsel pointed out that the issue was the parties' "disclosed intentions" and that since counsel's own office was negotiating with Beierschmitt, "someone from Plaintiff's counsel's office could testify" if Beierschmitt had "said that . . . Hertz did not intend to include Toshiba." Counsel also alluded to the unexplained delay between the lodging of defense objections to the proposed deposition and plaintiff's request for a continuance. Plaintiff's counsel pointed out that a continuance had been requested in the written opposition to summary judgment, but then addressed the more pertinent matter of delay in seeking to compel discovery, stating that when he filed opposition to the summary judgment motion, he "intended to file the motion [to compel] against Hertz, but we found a better way without having to stall off the Court with a discovery motion and its intended sanctions. I'd rather go to the—straight to the horse's mouth than spend my time pitting counsel against other counsel from what I consider to be frivolous objections. Let's hear it from Byer Smith [sic] directly. We're able to find him."

Finding that plaintiff had failed to satisfy the "statutory requirements," the court denied the request for a continuance and adopted its tentative ruling to grant the motion for summary judgment. The court's written order, drafted by defense counsel, provided in pertinent part, "Plaintiff fails to show that he may be able to discover facts essential to opposing Defendants' Motion for Summary Judgment. (See Code Civ. Proc., § 437c, subd. (h).)"

## B. *Discussion*

As relevant here, section 437c, subdivision (h), provides, "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court

shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just."

Where a party requests a continuance under the statute and satisfies its conditions, the determination whether to grant the request is vested in the discretion of the trial court, and will not be disturbed on appeal unless an abuse of discretion appears. (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 100 [20 Cal.Rptr.3d 1]; *Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 190 [133 Cal.Rptr.2d 408].) In exercising its discretion the court may properly consider the extent to which the requesting party's failure to secure the contemplated evidence more seasonably results from a lack of diligence on his part. (*Desaigoudar v. Meyercord, supra*, 108 Cal.App.4th at p. 190 ["Where a lack of diligence results in a party's having insufficient information to know if facts essential to justify opposition may exist, and the party is therefore unable to provide the requisite affidavit under Code of Civil Procedure section 437c, subdivision (h), the trial judge may deny the request for continuance of the motion."]; *Knapp v. Doherty, supra*, 123 Cal.App.4th 76, 102, quoting *FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 76 [41 Cal.Rptr.2d 404] [request for discovery properly denied where requesting party offered " 'no justification for the failure to have commenced the use of appropriate discovery tools at an earlier date' "]; *Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 257 [19 Cal.Rptr.3d 810] ["majority of courts" have held that "lack of diligence may be a ground for denying a request for a continuance of a summary judgment motion hearing"]; but see *Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 398 [107 Cal.Rptr.2d 270] [questioning whether diligence plays any proper role in the matter, given absence of any statutory reference to it].)[7]

No abuse of discretion appears here. First, plaintiff has offered no cogent justification for the extreme tardiness of his attempts to gather evidence concerning the understanding of Hertz's agent Beierschmitt with respect to the scope of the release. The action was filed in February 2009 and defendants raised the release as an affirmative defense in their answer filed in May of that year. There is no suggestion that plaintiff was surprised by

---

[7] A number of decisions have stated that the statute *mandates* a continuance whenever the requesting party files an affidavit fulfilling the statutory conditions. We question this reading, which is certainly not compelled by the terms of the statute. It plainly states that when a complying affidavit is filed, the court "shall" deny summary judgment or grant a continuance (perhaps with additional ancillary orders), *"or may make any other order as may be just."* (§ 437c, subd. (h), italics added.) This third option would appear to encompass a denial of relief, and plainly contemplates an exercise of discretion, presumably to be informed by the kind of factors traditionally considered in such contexts, including the requesting party's diligence or lack thereof. However, we need not set ourselves at odds with the decisions suggesting otherwise, because no complying declaration was filed here and the request for continuance therefore fell squarely within the rule entrusting the matter to the court's discretion.

defendants' construction of the release, and it is difficult to see how he could be, since their construction flowed from its plain terms. Plaintiff engaged counsel the day after he was injured, and assuming counsel could be excused for failing to turn his attention to the effect of the release at an earlier time, he was by his own admission on notice of that issue no later than June or July of 2010, when defense counsel made arguments at an arbitration hearing "concerning the nature and scope of the Release" agreement, which arguments led plaintiff's counsel to question defense counsel about the circumstances of the release. Plaintiff's counsel suggested rather obliquely that he might have only been alerted to the issue by defendants' arguments in support of the motion for summary judgment, but even supposing that had been convincingly shown—which it was not—counsel apparently did nothing for more than two months after the motion was filed. What he did then was serve a subpoena; but when defendants erected "a virtual stonewall of objections" in mid-December, counsel apparently did nothing for nearly three weeks more, at which time he filed his declaration recounting the above events and expressing an intention to move to compel discovery within 10 days. Instead, on the eve of the hearing on summary judgment, counsel discovered the adjuster's whereabouts by some other undisclosed means.

Conspicuously absent from this account is any attempt to explain why counsel did not seek to discover the whereabouts of Mr. Beierschmitt in June or July of 2010, why he still failed to act for two months after the motion for summary judgment was filed, and why he did not discover prior to January of 2011 that he had the means to find the adjuster without resort to formal discovery. So far as the record shows, counsel simply neglected to investigate the subject until the evening before the motion for summary judgment was heard.

Nor was this the only deficiency in plaintiff's showing in support of a continuance. It appears that the law office representing plaintiff in the court below also represented him throughout the settlement with Hertz. Yet no explanation was offered for counsel's apparent failure to offer a basis from his own knowledge, or from plaintiff's file, for inferring what the testimony of Hertz's agent would be.

We need not attempt to determine whether the record's silence on these points was the product of neglect, or of a deliberate attempt to create a factual lacuna as a basis for preventing or delaying the entry of summary judgment. The trial court was more than entitled to conclude that in view of this gap in the evidence, plaintiff had failed entirely to show that relief under section 437c, subdivision (h) would serve the interests of justice. The court thus acted within its discretion in denying the request for a continuance.

## Disposition

The judgment is affirmed.

Premo, J., and Elia, J., concurred.