Filed 7/30/21  Rebel Entertainment etc. v. Big Ticket Television etc. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| REBEL ENTERTAINMENT PARTNERS, INC., | B305862 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC613594) |
| v. | |
| BIG TICKET TELEVISION, INC.; CBS STUDIOS, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Affirmed.

Freedman + Taitelman, Bryan J. Freedman, Sean M. Hardy; Greines, Martin, Stein & Richland, Robin Meadow and Gary J. Wax for Plaintiff and Appellant.

Loeb & Loeb, James A. Curry, Daniel J. Friedman for Defendants and Respondents.

_____

Big Ticket Television, Inc. and CBS Corporation (collectively CBS), the production and distribution companies for *Judge Judy*, a popular television show, were contractually obligated to pay five percent of the "defined proceeds" derived from the show to Rebel Entertainment Partners, Inc. (Rebel), a talent agency and profit participant. Defined proceeds comprised gross receipts less specified expenditures, including amounts paid for the services of Judy Sheindlin, the star of the show. In 2009, CBS doubled Sheindlin's salary, which substantially reduced the defined proceeds, and thus Rebel's receipts. Rebel sued CBS for breach of contract, alleging that the increased amount paid to Sheindlin should have been accounted not as a salary boost but an additional profit participation share, which would not have cut into Rebel's participation share. The trial court granted summary judgment, finding no triable issue existed as to whether the increased payment to Sheindlin constituted a salary boost or participation share.

We affirm.

## BACKGROUND

### A. Rebel's Representation of Sheindlin

In 1995, Richard Lawrence, a show packager whose agency later became Rebel, sold a court-oriented show featuring Sheindlin, a New York family court judge, to CBS. As part of the package, CBS agreed to pay Lawrence's agency an upfront percentage of the budget and a backend five percent of the show's "Defined Proceeds."[1]

---

[1] Neither Lawrence nor Rebel was ever Sheindlin's agent.

2

1.     Upfront Three Percent Commission

The agency agreement provided that Rebel would receive a commission of "three percent (3%) of the approved final Production Budget of each episode" of *Judge Judy*.  "Production Budget" was defined as the "aggregate actual, out-of-pocket cost of producing each episode."

2.     Backend Five Percent Participation

The agreement further provided, as amended in 2005, that Rebel would receive five percent of the "Defined Proceeds derived from the exploitation" of *Judge Judy*.

"Defined Proceeds" comprised "the excess, if any of 'Gross Receipts' over the total of the 'Distribution Fees,' the 'Distribution Expenses,' and the 'Cost of Production' in such order."

"Cost of Production" was defined as "all direct out of pocket payments made or incurred by [Big Ticket], in good faith, on a reasonable basis, and consistent with customary practice in the United States television industry, in connection with the production of [*Judge Judy*] and including all amounts incurred in connection with the production thereof calculated according to the standard accounting practices now or hereafter employed by [Big Ticket] on a reasonable basis and consistent with customary practice in the United States television industry.  Such payments shall include . . . those for . . . amounts paid or payable for services of performers [and approximately 21 additional and sometimes complex line items]."

3.     Exclusion of Payments to Profit Participants

Defined proceeds were not to be reduced by "sums paid or payable to any third party profit participant . . . ."

## B.    Sheindlin's Pay Increase

Sheindlin met with CBS every three years to present an envelope with a new, non-negotiable salary demand, and told CBS that if her demand was not met, she would terminate their relationship and produce *Judge Judy* herself.  In 2009, after one such demand, CBS doubled Sheindlin's salary to $45 million, three years later increasing it to $47 million, making her by far the highest paid host on television.  (The average of the next top five salaries in television was $17.8 million.)

CBS allocated Sheindlin's entire compensation as a cost of production, which reduced the show's defined proceeds to a negative balance, effectively stripping Rebel of its five percent participation receipts.

## C.    Summary Judgment

Rebel sued CBS for breach of contract and breach of the implied covenant of good faith and fair dealing, and sought an accounting.  It alleged that CBS's allocating Sheindlin's entire compensation as a cost of production instead of attributing some of it to backend profit participation was in bad faith and violated its obligation to act reasonably and consistent with customary practice in the United States television industry.

CBS moved for summary adjudication, arguing it could not have been unreasonable for CBS to agree to Sheindlin's non-negotiable salary demand, because she had the "unique ability to end the 'juggernaut' show simply by walking away from it."

In support of the motion, Sheindlin testified in deposition that she conveyed her nonnegotiable salary requirements to CBS every three years, and told the company she would produce a court show herself if her demands were not met.  CBS had been unable to "find another Judy," and knew she could take *Judge*

4

*Judy* to another producer, or produce her own court show. Sheindlin told CBS, "[t]his is not a negotiation," and said, "You want it, fine. Otherwise, I'll produce [a show] myself." She testified, "CBS had no choice but to pay me what I wanted because otherwise I could take it wherever I wanted."

On one occasion, an executive presented Sheindlin with his own proposal, sealed in an envelope. Sheindlin testified, "he came to the meeting at the Grill on the Alley, and I handed him my envelope, and he said, 'Judy, I have my own envelope.' And I said, 'I don't want to look at it.' He said, 'Why not? Maybe it's more than what's in your envelope.' And I said, 'Well, John, if I look at your envelope, it's a negotiation. This isn't a negotiation.' And he put his envelope away and they gave me what I wanted."

In support of its opposition to the motion, Rebel submitted the declaration of Sabrina Robinson, an expert in the financial and business aspects of the television industry, who stated that charging 100 percent of Sheindlin's $47 million salary to production costs was "inconsistent with customary practice in the United States television industry."

Robinson declared, "it is the custom and practice in the television industry that, if a production company elects to pay talent an increased upfront fee, such increased fee will not be of such a magnitude as to deprive profit participants from realizing any profit participation benefits. It is further the custom and practice in the television industry for a production company to act reasonably toward profit participants with respect to allocation of the production costs of a television series, including the salaries of talent."

Robinson declared that $45 million was "significantly in excess of a reasonable salary and inconsistent with customary

5

practice in the United States television industry." She showed that other top television industry personalities, such as David Letterman, Jay Leno, and Conan O'Brien, received annual salaries of $28 million or less in 2010. "Therefore," she declared, "the significant difference between the amounts paid to Judy Sheindlin and industry standard represent an in-substance participation on Judge Judy."

Robinson declared that amounts "significantly in excess of a reasonable salary" would ordinarily be paid as part of a recipient's contingent compensation. Robinson "determined the amount of [Sheindlin's] in-substance participation" based on the average salaries paid to other top syndication performers, concluding that approximately $27.2 million of Sheindlin's $45 million salary—and half of the $2 million increase three years later—was, in substance, a profit participation.

Referencing no specific passage of the agency agreement, Robinson opined that deducting $45 million as a production cost was "contrary to the Agreement," and Big Ticket's conduct "unilaterally changed the very terms and condition[s] of Rebel's Agreement."

Finally, Robinson declared that CBS's deduction of Sheindlin's entire salary "resulted in a show, which had only previously reported profits to Rebel, to change irrevocably to a permanent net loss deficit reported to Rebel. Based on this current method of reporting, it would be impossible for Rebel to ever achieve profits again."

The trial court found no triable issue of material fact as to whether CBS breached the express terms of the agency agreement or the implied covenant of good faith and faith dealing. The court found that CBS had established that

6

Sheindlin's salary was reasonable and consistent with practices in the United States television industry, concluding, "[t]hat Judge Sheindlin is paid more than other television hosts does not establish her salary is unreasonable or that Defendants negotiated the salary in bad faith." The court therefore granted summary adjudication and, the parties having settled all other claims, entered judgment for CBS.

## DISCUSSION

Rebel takes no issue with the amount CBS paid Sheindlin, but contends triable issues exist as to whether CBS breached its contractual obligation to allocate that cost in good faith, on a reasonable basis, and consistent with customary practice in the television industry.

### A.    Legal Principles

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

The law implies in every contract, a covenant of good faith and fair dealing, a supplement to express covenants. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) " 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits.' " (*Ibid.*)

"The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question

7

determined solely by reference to the contract's terms." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126.) "When the contract has been 'reduced to writing,' the parties' intention 'is to be ascertained from the writing alone, if possible,' subject to other rules of interpretation." (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1028.)

A trial court properly grants summary judgment " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) A defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)" (*Neiman v. Leo A. Daly Co.* (2012) 210 Cal.App.4th 962, 967.) "Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid.*)

On appeal, we apply an independent standard of review to determine whether a trial is required—whether the evidence favoring and opposing the summary judgment motion would support a reasonable trier of fact's determination in the plaintiff's favor on the cause of action or defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In doing so we view the evidence in the light most favorable to the party opposing summary judgment. (*Id.* at p. 843; *Alexander v. Codemasters*

*Group Limited* (2002) 104 Cal.App.4th 129, 139.) We accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385-1386.)

## B.     Application

Rebel argues that triable issues exist as to whether CBS breached its contractual obligation to allocate costs of production in good faith, on a reasonable basis, and consistent with customary practice. We discern no such issues.

The agency agreement provided that Rebel would receive five percent of the "defined proceeds" derived from the exploitation of *Judge Judy*. "Defined proceeds" was defined as "the excess, if any" of gross receipts over certain expenses, including the "cost of production."

"Cost of Production" was defined as "all direct out of pocket payments made or incurred by [Big Ticket], in good faith, on a reasonable basis, and consistent with customary practice in the United States television industry, in connection with the production of [*Judge Judy*] and including all amounts incurred in connection with the production thereof calculated according to the standard accounting practices now or hereafter employed by [Big Ticket] on a reasonable basis and consistent with customary practice in the United States television industry. Such payments shall include . . . those for . . . amounts paid or payable for services of performers."

The "cost of production" provision thus comprises two sentences, the first of which sets forth two categories of costs: "direct out of pocket *payments made or incurred*" and "*amounts . . . calculated* according to the standard accounting

9

practices." (Italics added.) The phrase "such payments shall include" in the second sentence specifies that the first cost category, "payments made or incurred," includes amounts paid for the services of performers.

Sheindlin's testimony established that CBS was forced to accept her demands for $45 million in 2009 and $47 million in 2012, as failing to do so would jeopardize the profitable show. Payments to her therefore constituted costs of production.

This evidence carried CBS's burden to establish three things. First, CBS's obligations to Sheindlin were incurred in good faith, as it had no choice but to accept her demands in order to keep *Judge Judy* on the air. Second, CBS's obligations to Sheindlin were consistent with customary practice, which, as Robinson's declaration showed, is to pay indispensable top performers handsomely. Third, the payments to Sheindlin were made for her services, which payments the agency agreement classified as production costs. Rebel apparently disputes none of these facts.

Because the agency agreement classified amounts paid to performers as production costs, and required CBS to incur production costs reasonably and in good faith, consistent with industry standards, CBS's evidence carried its burden of showing that it performed its obligations under the agreement.

The burden thereafter shifted to Rebel to demonstrate a triable issue as to whether CBS breached its contractual obligation to make or incur direct out of pocket payments to Sheindlin in good faith, on a reasonable basis, and consistent with customary practice. Rebel offered no evidence to do so, but on the contrary acknowledges that CBS had the right to make the deal that it did.

Rebel's quarrel is thus not with the Sheindlin deal, but with CBS's expense sheet. It argues that the agency agreement imposed on CBS an "express" obligation to *allocate* costs of production in good faith. But Rebel identifies no such express term, and we have been unable to locate it. No pertinent provision of the agency agreement uses the word "allocate," so whatever CBS's obligation to allocate costs might be, it must be implied, not express.[2]

Rebel argues this obligation may be found in the second clause of the first sentence of the agency agreement's production-cost provision, which Rebel argues obligates CBS to *account* for Sheindlin's salary in good faith, on a reasonable basis, and consistent with customary practice in the television industry. To do so, Rebel argues, CBS had to apportion part of Sheindlin's salary to participation expenses. We reject both the premise and the conclusion.

As noted above, after the "payments made or incurred" clause, the agency agreement states that further costs of

---

[2] One section of the agency agreement does mention allocation. That section, entitled "Allocation Among and Grouping of Episodes" states: "If the Episodes are licensed or otherwise exploited in combination with other Episodes and/or photoplays, then the Gross Receipts, Distribution Fees, Distribution Expenses and Costs of Production with respect to such Episodes or Subsidiary Rights shall be allocated in such manner as [CBS] may determine in its good faith business judgment, on a reasonable basis and consistent with custom and practice in the United States television industry." But we fail to discern, nor Rebel to explain, how allocation of production costs among combined episodes obligates CBS to allocate Sheindlin's salary between production costs and participation rights.

11

production include "amounts . . . calculated" according to standard accounting practices. The agreement mandates that those amounts be "calculated according to the standard accounting practices now or hereafter employed by [Big Ticket] on a reasonable basis and consistent with customary practice in the United States television industry."

Assuming for the sake of argument that "on a reasonable basis" applies to the verb "calculated," such that "amounts incurred in connection with the production" of *Judge Judy* must be "calculated . . . on a reasonable basis and consistent with customary practice in the United States television industry," those amounts do not include Sheindlin's salary, which, as stated, was not calculated by CBS at all, but imposed by Sheindlin.

Assuming further that "amounts calculated" included Sheindlin's salary, nothing about "calculating" those amounts suggests her salary should be apportioned on CBS's expense sheet in any particular respect. But if such an obligation existed, the undisputed evidence showed that Sheindlin gave CBS no option to allocate her salary in some manner other than the way it did. Any apportionment of Sheindlin's salary to some form of profit participation would, by definition, introduce risk that Sheindlin was unwilling to accept. In any event, we have discovered no authority, and Rebel offers none, obligating an entity to reclassify a performer's salary as something other than salary for accounting purposes.

Robinson's declaration lacked foundation, was speculative, and ventured into legal conclusions. Her opinion that the industry standard was for the objectively excessive portion of a salary to be deemed an "in-substance" participation was unsupported by any explanation about either the basis for this

12

opinion or about what constitutes an "objectively" excessive salary, and took no account of the unique situation presented by Sheindlin's demands. "If a witness is testifying as an expert, [her] testimony in the form of an opinion is limited to such an opinion as is [¶] . . . [¶] . . . [b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801.) " 'An expert opinion has no value if its basis is unsound.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; see also *McGonnell v. Kaiser Gypsum Co., Inc.* (2002) 98 Cal.App.4th 1098, 1106 [party "cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation, or reasoning"].) Robinson's opinion that the CBS's accounting practices violated the agency agreement is of course entitled to no weight. (*Kasem v. Dion-Kindem* (2014) 230 Cal.App.4th 1395, 1400-1401 [expert opinion is incompetent on as to the legal interpretation of contracts].) Robinson made no effort even to mention Sheindlin's demands, much less explain how they fit into her theory or would customarily be handled in the television industry. It therefore raised no triable issue.

Rebel argues CBS acted in bad faith by failing to ask whether Sheindlin would accept her demanded compensation in some form of a high-level participation percentage, such as a first-dollar gross participation, which Rebel argues would be just as reliable as a salary. It argues that no evidence established that Sheindlin would have rejected such an arrangement.

Assuming for the sake of argument that some form of non-production compensation would have been as reliable as a salary,

13

a matter on which the record is silent,[3] the undisputed evidence was that Sheindlin brooked no counterproposals, but instead made demands on a take-it-or-leave-it basis, saying, "This is not a negotiation." The only time she was presented with a counterproposal, she rejected it unread. No principle or authority obligated CBS to cajole Sheindlin into considering counterproposals.

Rebel argues it was unreasonable for CBS to "permanently manipulate[] Costs of Production." But there is no evidence CBS did so. The agency agreement provided that amounts paid for the services of performers constituted production costs. Sheindlin demanded payment for her services. That payment was therefore made a production cost by the agreement, not by CBS.

Rebel argues that CBS failed to follow the television industry's customary practices by "combining Judge Sheindlin's existing salary with what would ordinarily be a contingent participation." But again, no evidence suggests CBS did so. The undisputed evidence was that it paid Sheindlin for her services, and that the agency agreement deemed this type of payment to be a production cost.

---

[3] And a matter which Rebel itself apparently does not believe is possible, as it acknowledges that "[t]he highest level of contingent participation is a percentage of gross receipts—the compensation comes right off the top, ahead of the studio's profits. . . . That was effectively the position in which CBS placed Judge Sheindlin—although actually Judge Sheindlin's position was even better, since her salary was guaranteed even before any revenue arrived." Rebel also acknowledges that "[t]he effect of CBS's allocation was that (a) Judge Sheindlin's compensation was no longer subject to any contingent risk."

14

Finally, Rebel argues CBS breached the covenant of good faith and fair dealing by injuring Rebel's right to receive benefits from the agency agreement.  For reasons discussed above, we disagree.  Rebel lost benefits under the agency agreement not because of any action by CBS but because Sheindlin demanded a large salary, the agreement provided that the salary of a performer constitutes a cost of production, and the agreement further provided Rebel's benefit would be reduced by the costs of production.

## DISPOSITION

The judgment is affirmed.  Respondents are to receive their costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

15