Filed 2/27/15    Certified for publication 3/30/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| RONALD LEE CLINE, | C073999 |
| Plaintiff and Appellant, | (Super. Ct. No. CV35615) |
| v. | |
| BERNIECE DELORES HOMUTH, | |
| Defendant and Respondent. | |

Plaintiff Ronald Lee Cline was severely injured when his motorcycle collided with a turning car driven by a teenager with a provisional license.  He settled with the driver and the driver's parents for their $100,000 insurance policy limit.  Cline executed a release that released the driver and his parents "and any other person, corporation, association, or partnership responsible in any manner or degree" for the accident.

Cline subsequently sued defendant Berniece Delores Homuth, the driver's grandmother and the sole adult in the car with him at the time of the collision, for negligent supervision.  Homuth raised the release as an affirmative defense.  She moved

1

for summary judgment; the trial court denied the motion. A court trial followed, centering on the validity of the release and whether Homuth was an intended third party beneficiary of the release. Relying on *Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020 (*Rodriguez*), the trial court found the release "unambiguously expresses a mutual intent to benefit a class of persons of which [Homuth] is a member" and that Homuth was entitled to enforce it.

Cline appeals from the judgment in favor of Homuth. He contends the extrinsic evidence demonstrates that Homuth is not an intended beneficiary of the release. As we explain, Cline failed to provide sufficient evidence to counter Homuth's showing that she was an intended beneficiary of the release. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Accident*

On April 9, 2007, Colby Homuth (Colby), who had a provisional driver's license requiring immediate supervision by an adult (Veh. Code, § 12814.6), was driving his parents' car on O'Byrnes Ferry Road. Homuth, his grandmother, was the sole passenger in the car. As Colby turned left onto Pheasant Run Drive, Cline's motorcycle approached and struck the back of the car. The traffic collision report concluded Colby caused the accident. Cline was severely injured, suffering numerous broken bones.

*Settlement and Release*

Colby's parents, Wade and Leslie Homuth, had automobile insurance with California State Automobile Association (CSAA). The policy's limit for bodily injury claims was $100,000 per person. Cline's attorney, Gerald Emanuel, made a demand to Angelo Rodriguez, CSAA's claims representative, for the policy limit.

Rodriguez knew Cline's medical expenses exceeded the policy limits and believed payment of the policy limit was appropriate. On March 26, 2008, Cline signed a settlement agreement with CSAA. The "Release of All Claims" was a printed form with

2

blanks for the name of the party signing and the parties released, as well as the amount of compensation and the date and location of the accident. The portions filled in were in all capitals. The release stated in part: "To be executed by RONALD CLINE. The undersigned do(es) hereby acknowledge acceptance of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) Payable to RONALD CLINE & GERALD E. EMANUEL AS ATTORNEY AND MEDICARE which payment is accepted in full compromise settlement and satisfaction of and as sole consideration for the final release and discharge of all actions, claims and demands whatsoever, that now exist, or may hereafter accrue against LESLIE & WADE HOMUTH; COLBY HOMUTH and any other person, corporation, association or partnership responsible in any manner or degree for injuries to the person and property of the undersigned, and the treatment thereof, and the consequences flowing therefrom, as a result of an accident, casualty or event which occurred on or about the 9TH day of APRIL 2007 at or near STR: O'BYRNES FAIRY [*sic*] RD CITY, COUNTY: COPPEROPOLIS, CALAVERAS ST: CA and for which the undersigned claims the above named persons or parties are legally liable in damages which legal liability and damages are disputed and denied . . . ." Cline also waived the provisions of Civil Code section 1542 relating to unknown claims.

*The Lawsuit*

Cline filed a lawsuit against Homuth for damages based on negligent supervision. She moved for summary judgment, contending she was released from all claims by the unambiguous "any other person" language of the release.

The trial court denied the motion, finding a triable issue of fact as to whether the release was intended to benefit Homuth. The court found Cline had submitted evidence showing he had no such intent. This evidence included declarations from Cline and his attorney stating that he would not have signed the release if it had named Homuth as a

3

releasee, that neither Cline nor his counsel intended to release Homuth, and that although Homuth was known by the parties to the settlement, she was not named in the release.

Homuth moved to have the trial court determine the legal effect of the release. The court granted that motion.

*The Trial*

Portions of Rodriguez's deposition were admitted at trial, as he was unavailable. Rodriguez testified he needed management approval to change the terms of the release; in 13 years working in claims, he had seen changes to the form only once or twice. He had completed the blanks on the release form and chose to include only the named and covered insureds, Wade, Leslie and Colby Homuth. He described the form release: "In the context of the language that's used in the industry we are releasing the world, if you will." He also described the language as "pretty self-explanatory." Rodriguez explained he did not consider adding Homuth's name to the release because she was not a named or covered insured. His duty was only to the insureds and he had authority to settle only as to them. There was no discussion, negotiation, or consideration of an intention to release others or to add Homuth's name to the release. Rodriguez was aware that Homuth was in the car at the time of the accident.

Emanuel--Cline's attorney at the time of the release--testified that about 90 percent of the personal injury cases he handled were resolved by a release and dismissal. He had altered the language of a release only when the numbers were wrong. There was no written communication about excluding Homuth from the release and Emanuel never told anyone representing Colby of the intent to exclude Homuth. Emanuel had no experience in attempting to negotiate the language of a boilerplate release and he had never heard of anyone negotiating a boilerplate release.

Emanuel testified he investigated a possible claim against the state or county for the road construction and intended to investigate Homuth. He never expressed an

4

intention to release Homuth, but Cline would not have signed the release if Homuth had been named. Emanuel did not believe the boilerplate release applied to Homuth. He was aware of her potential liability when the release was signed.

Cline testified he signed the release while on heavy medication and did not really understand it. He intended to sue Homuth, the city, and the construction site. He had discussed the release with a friend and believed he could still pursue others. He told his attorney other people were responsible for the accident, and did not intend to release those not named. He would not have signed the release if it had named Homuth. Cline had no documents showing his intent to sue others.

Clinton Miller testified as an expert on insurance claims. He testified "almost everything" in insurance companies is boilerplate, and that a claimant could not modify a release; it was offered on a take-it-or-leave-it basis. Miller attempted to testify that the industry standard was that only those persons specifically named in the release were actually released, but the trial court sustained Homuth's objections to this testimony.

The trial court, relying on *Rodriguez, supra,* 212 Cal.App.4th 1020, found the language of the release "unambiguously expresses a mutual intent to benefit a class of persons of which [Homuth] is a member"; thus Homuth was entitled to enforce the release. The court granted Homuth's motion to strike the parol evidence which was admitted to show the intent of Cline, Emanuel and Rodriguez and entered judgment in favor of Homuth.

## DISCUSSION

### I

### *The Law*

A. *Third Party Beneficiaries and Contract Interpretation*

A release given in good faith to a tortfeasor does "not discharge any other such party from liability unless its terms so provide." (Code Civ. Proc., § 877, subd. (a).) To

5

determine whether the "terms so provide," we apply the rules governing contract interpretation.  (*Hess v. Ford Motor Company* (2002) 27 Cal.4th 516, 524 (*Hess*).)

A third party may enforce a contract that is expressly made for his benefit.  (Civ. Code, § 1559.)  The third party need not be named in the contract, but he has the burden to show the contracting parties intended to benefit him.  (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 436.)  Determining this intent is a question of contract interpretation.  (*Ibid.*)  "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible.  And, '[i]n the absence of grounds for estoppel, the contracting parties should be allowed to testify as to their actual intention . . . .'  [Citations.]"  (*Id.* at p. 437.)

A contract must be interpreted to give effect to the mutual intention of the parties at the time of contracting.  (Civ. Code, § 1636.)  The intention of the parties to a written contract is to be determined from the writing alone, if possible; subject, however, to other statutory rules of contract interpretation.  (*Id.,* § 1639.)  These rules include the following.  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  (*Id.*, § 1647.)  "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."  (*Id.*, § 1648.)  The written provisions of the contract prevail over printed portions.  (*Id*., § 1651.)

"As has been recognized by our Supreme Court, it is often impossible for the parties to be precise in expressing their intent in a written document.  Therefore, even if the trial court personally finds the document not to be ambiguous, it should preliminarily consider all credible evidence to ascertain the intent of the parties.  'The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to

6

prove a meaning to which the language is "reasonably susceptible." ' [Citation.]"
(*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 555 (*Appleton*).)

   B. *Third Party Beneficiaries of a General Release--Case Law*

   Many releases, such as the one involved here, are general releases and have broad language purporting to release every person or entity.  As Witkin has noted, "The courts have differed regarding the effect of a general release."  (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 73, p. 146.)

   In *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435 (*General Motors*), the release in a personal injury case following an automobile accident released the other driver and " 'any and all person, firms and corporations, whether herein named or referred to or not.' "  (*Id.* at p. 439.)  The court held the clear, unambiguous language was sufficient to release General Motors, the manufacturer of the car, where there was no competent evidence to suggest any other possible meaning of the language.  (*Id.* at p. 441.)  The surrounding circumstances also supported the intention to release General Motors as the parties were aware of a potential claim against the manufacturer and the other driver had an incentive to release all other potential tortfeasors to "avoid being dragged into any lawsuits."  (*Id.* at pp. 442-443.)

   In another personal injury case arising from an automobile accident, a general release applied to the driver's employer.  (*Lama v. Comcast Cablevision* (1993) 14 Cal.App.4th 59 (*Lama*).)  The release stated it released the driver and the owner of the car " 'and any other person, corporation, association or partnership charged with responsibility for injuries to the person or property of the Undersigned . . . as a result of the accident . . . .' "  (*Id.* at p. 61.)  After executing the release, plaintiff dismissed his entire complaint with prejudice and subsequently, with new counsel, filed suit against the employer of the other driver, alleging that driver was driving in the course and scope of employment.  (*Id.* at pp. 61-62.)  Plaintiff's first attorney had conducted no discovery as

7

to whether the other driver was acting in the course and scope of employment and the evidence showed the insurance company had no such knowledge. (*Id*. at pp. 62-63.) The appellate court found any mistake as to the scope of the release was the unilateral mistake of plaintiff's first counsel; the insurance company intended to obtain a full release to protect the insured. (*Id*. at p. 63.)

In *Appleton, supra,* 27 Cal.App.4th 551, plaintiff filed a personal injury action against the other driver in the accident, the owner of the other car, and a broker who allegedly arranged for the car to be loaned to an organization affiliated with the other driver. The plaintiff settled with the owner and agreed to dismiss the broker, and signed a general release in favor of the owner, the broker, and " 'all other persons, firms, associations and corporations.' " (*Id*. at p. 554.) The trial court determined the settlement was in good faith, and the plaintiff dismissed the owner and the broker from the action. He then served the other driver, who successfully moved for summary judgment based on the broad terms of the release. (*Id*. at pp. 553-554.) The appellate court reversed, finding both *General Motors* and *Lama* distinguishable because the plaintiff had advised the settling parties he intended to proceed against the driver, he did not dismiss the entire action, and he provided extrinsic evidence to show there was no intent to release the driver. (*Appleton, supra,* at pp. 556-557.)

The issue of the scope of a general release where an injured party settles with an alleged tortfeasor's insurer, signing a release that ostensibly releases everyone, and then proceeds against another alleged tortfeasor who raises the general release as a defense arose again in *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337 (*Neverkovec*). The *Neverkovec* court concluded "that principles of contract law governing the rights of third party beneficiaries, and related rules of evidence, provide the best approach for resolving such cases." (*Id*. at p. 341.) Under the law of third party beneficiaries to a contract, the third party had the burden of proving he was an intended beneficiary. "The circumstance

8

that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement. The contracting party must have intended to confer a benefit on the third party." (*Id*. at p. 348.) "Because the court must consider the circumstances of the contracting parties' negotiations to determine whether a third party not named in the release was an intended beneficiary, it will seldom be sufficient for the third party simply to rely on a literal application of the terms of the release." (*Id*. at p. 349.) The court reversed summary judgment, finding Fredericks did not bear his burden to show he was an intended beneficiary. It found that even if the general release was sufficient to shift the burden, the extrinsic evidence before the court created a triable issue regarding the parties' intent to release Fredericks. (*Id*. at p. 344.)

Although the *Neverkovec* court spoke of extrinsic evidence, the major piece of evidence that created a doubt as to the parties' intention, and thus a triable issue of fact, was another provision of the release. That provision required the plaintiff to repay any amounts that anyone chargeable with liability for the plaintiff's injuries might be compelled to pay in the future. (*Neverkovec, supra,* 74 Cal.App.4th at p. 352.) The court found this provision "curious" and that it created an ambiguity as to the parties' intentions. "If the release was to be operative against anyone liable for [the plaintiff's] injuries, [the plaintiff] could not be expected to recover further amounts from which to make repayments." (*Ibid*.)

Our Supreme Court considered whether a general release with broad language ostensibly releasing all potential tortfeasors bars the plaintiff's claims against a tortfeasor who was not a party to the release in *Hess, supra,* 27 Cal.4th 516. In *Hess*, the plaintiff was riding in a Ford truck when the truck was struck by another driver; the truck rolled over and Hess suffered serious injuries rendering him a paraplegic. In exchange for the policy limit of $15,000, Hess signed a release that named the other driver, his insurance company, the underwriters adjusting company, all agents, employees, successors "and all

9

other persons, firms, corporations, associations or partnerships" from all claims due to the accident. Several months later, Hess sued Ford and others, who successfully sought summary judgment based on the release. (*Id*. at p. 521; see also *id*. at pp. 520-521.) In a separate lawsuit against the other driver and his insurer, Hess succeeded in reforming the release to strike the "all other persons, firms, corporations, associations or partnerships" language due to mutual mistake. He then moved for a new trial in his action against Ford. The trial court denied the motion, but the Court of Appeal reversed, and a trial was held. At that trial, Ford presented only the release as evidence. Hess presented testimony that he, his first attorney, and the claims adjuster did not intend to release Ford; they had discussed Hess's intention to sue Ford; his attorney bought the truck to use as evidence in a trial against Ford; and Hess would not have settled if the release had released Ford. (*Id*. at pp. 521-522.) The jury returned a large verdict for Hess. (*Id*. at p. 523.)

The *Hess* court found Hess offered no reasonable alternative construction of the broad language of the release and failed to allege any ambiguity so his only defense to Ford's claim was mutual mistake. (*Hess, supra,* 27 Cal.4th at p. 525.) The court found, however, the uncontroverted extrinsic evidence established a mutual mistake as all the parties to the release did not intend to release Ford. (*Id*. at pp. 526-527.) The court further noted the language of the release was "hardly conclusive because it supports a finding that the contracting parties did not intend to release Ford from liability." (*Id*. at p. 527.) The court noted the small settlement despite the severity of Hess's injuries and the failure to name Ford despite everyone's awareness of Hess's claims against Ford arguably supported a finding that the contracting parties did not intend to release Ford. (*Ibid*.) The court also found its conclusion was consistent with other cases. It noted the lack of extrinsic evidence that the parties did not intend to release other tortfeasors in *General Motors* and *Lama*, and the reversal of summary judgment for the defendant in

10

*Neverkovec* and *Appleton* where there was such extrinsic evidence. (*Hess, supra,* at pp. 529-530.)

Justice Kennard's concurring opinion, joined by two other justices, offered a different analysis, but reached the same result. It found that Ford failed to carry its burden to show it was a third party beneficiary of the release. (*Hess, supra,* 27 Cal.4th at p. 534, conc. opn. of Kennard, J.) "That burden cannot be discharged by sole reliance on the literal reading of the language in the contract." (*Id.* at p. 535.) The concurring opinion did not rely solely on Ford's failure to carry its burden. "Moreover, even if we were to consider the release as evidence supporting Ford's claim to be a third party beneficiary, the properly admitted evidence overwhelmingly refutes its claim." (*Ibid.*) Although the same result was reached by either analysis in this case, the concurrence noted that may not always be the case as the difference in whether the party claiming to be a third party beneficiary or the party claiming a mutual mistake bears the burden of proof "could be decisive in another case." (*Id.* at p. 536.)

"[T]he question of how much evidence a defendant must present to establish a right to summary judgment under a global release by the plaintiff of 'all persons' exposed to liability for his personal injuries" was addressed again recently in *Rodriquez, supra,* 212 Cal.App.4th at page 1023, the case on which the trial court relied here. The *Rodriguez* court disagreed with *Neverkovec* to the extent that *Neverkovec* (1) always required consideration of the circumstances of the negotiations of parties to a general release, and (2) held that a third party could not rely solely on the language of a general release to carry its prima facie burden to show it was an intended third party beneficiary of the general release. (*Rodriguez, supra,* 212 Cal.App.4th at p. 1030.) In so doing, the *Rodriguez* court disagreed with portions of the *Neverkovec* opinion that were cited or quoted with approval by our Supreme Court in *Hess, supra,* 27 Cal.4th at page 524. The *Rodriguez* court, however, did not hold the "all persons" language of the general release

11

was *always* sufficient to establish an intent to benefit any third party. Rather, it held that such language was sufficient to show a prima facie case and was sufficient to prevail "in the absence of countervailing evidence." (*Rodriguez, supra,* at p. 1027.) The only evidence the plaintiff offered to counter the language of the release was "his own subjective intent, and even that evidence was strikingly vague at best." (*Id*. at p. 1034.) The third party seeking to enforce the release was the employer of the other driver in the accident. (*Id*. at p. 1025.) The court found the omission of the employer from the release was probably because the insurance adjuster who prepared the release was unaware of the employment relationship; further, the adjuster had an incentive to extend the release to the employer because the employer had paid for the insurance. (*Id.* at p. 1035.)

As we have described *ante*, the cases vary as to their approach in determining the scope of a general release and what evidence is necessary to obtain or defeat summary judgment on the basis that the general release bars a claim against another tortfeasor. It is consistently clear, however, that the law permits a plaintiff who opposes enforcement of a general release by a third party to offer extrinsic evidence as to the circumstances surrounding negotiation and signing of the release to attempt to show that releasing "any other person," meaning *everyone*, does not comport with the parties' intent.[1] Such evidence was lacking in *General Motors, Lama,* and *Rodriguez.* Such evidence was present in *Appleton*, *Neverkovec* (where the language of the release was ambiguous as

---

[1] Here, *after* hearing all the extrinsic evidence, the trial court found the release was unambiguous and granted Homuth's motion to strike the extrinsic evidence. The trial court nevertheless summarized this evidence in its decision. Therefore, we presume the trial court determined Cline failed to present sufficient evidence to overcome Homuth's evidence that the parties intended the release to benefit Homuth as a member of the class of "all other persons." Because we conclude the trial court was correct in its ultimate determination, we need not address Cline's argument that it erred in striking the extrinsic evidence.

12

well), and *Hess*. The issue here is once Homuth presented evidence to show she was an intended beneficiary of the release, whether Cline offered competent evidence of the parties' intent and, if so, whether this evidence was sufficient to show the parties to the release did not intend to benefit Homuth, but rather to exclude her from the protection of the release, despite its plain language which extended to the "world."

II

*Analysis*

Unlike *General Motors, Appleton, Neverkovec,* and *Rodriguez*, this case comes to us not after a motion for summary judgment, but after a court trial at which extrinsic evidence was heard (although later "stricken"). Unlike in *Rodriguez*, Homuth did not rely solely on the language of the release, but also offered excerpts of the deposition of Rodriguez in which he stated he understood the release to cover "the world," the language was "self-explanatory," and that there was no discussion, negotiation, or consideration as to whether the release applied to Homuth. We need not take sides in the dispute between the *Rodriguez* and *Neverkovec* courts (and the *Hess* majority and concurring opinions) and decide whether the language of a general release is sufficient *alone* to establish a prima facie case for enforcement of the release by a third party. Here, as we explained *ante*, Homuth offered additional evidence which was properly heard. Therefore, we consider it, in addition to the general release.

Cline contends the release itself was ambiguous as to both its temporal and geographic scope. The release refers to any "accident, casualty or event which occurred on or about the 9TH day of APRIL 2007 at or near STR: O'BYRNES FAIRY [*sic*] RD CITY, COUNTY: COPPEROPOLIS, CALAVERAS ST: CA." Cline contends the "on or about" language makes the release uncertain as to whether it covers a subsequent act of medical malpractice on Cline and using the name (misspelled) of the road rather than the intersection at which the collision occurred makes the release uncertain. Whatever

13

merit Cline's argument may have as to the ambiguity of these particular portions of the release is beside the point as neither portion is at issue here. Any uncertainty as to the temporal or geographic scope of the release is immaterial as to the question before us-- whether the release applies to bar Cline's action against Homuth. There is no dispute as to what event--the accident at the intersection of O'Byrnes Ferry Road and Pheasant Run Drive on April 9, 2007--triggered Homuth's potential liability.

Cline contends the language of the release shows it was intended to affect the liability of only those specifically named. After specifying the time and place of the accident, the release states: "for which the undersigned claims the above named persons or parties are legally liable in damages which legal liability and damages are disputed and denied . . . ." Cline reads that language to mean the release covers *only* the named parties. We disagree with Cline's reading. This language merely provides additional details about the covered event; it does not narrow or limit its coverage.

Cline contends the deposition testimony of Rodriguez as to releasing the world is ambiguous and confusing because he conceded the release may not apply if an ambulance taking Cline to the hospital was involved in an accident, because that event would be a separate occurrence. Again, we disagree. Rodriguez's concession that the release may not apply to an accident involving the ambulance speaks to what *events* the release covers, not what *persons* it covers.

Cline next contends the release is ambiguous because Homuth's name was not written directly into the form release with the other three members of her family. Relying on *Appleton*, *supra,* 27 Cal.App.4th 551, Cline argues Homuth was known to both parties and she was not "just a peripheral actor," so that she was not named created an apparent ambiguity. In *Appleton*, however, the unnamed tortfeasor was a named party defendant in the personal injury action and the cause of the accident; thus plaintiff's intent to pursue him for damages was known to all parties to the release. (*Id.* at p. 555.) Here, although

14

Rodriguez knew Homuth was in the car, there was no evidence he knew Cline considered her a potential defendant at the time of the release's preparation. Emanuel never communicated his intent to exclude Homuth from the release.

Cline points to Rodriguez's testimony that Homuth was not named in the release because he had a duty to protect only named and covered insureds. Cline interprets this testimony as showing that Rodriguez intended to release only Colby, Wade and Leslie Homuth. Rodriguez, however, also testified he understood the "pretty self-explanatory" language of the release to cover "the world." Rodriguez's deposition testimony established that he was concerned only about releasing Colby and his parents, but it does not show he intended Homuth to be *excluded* from the broad coverage of the release, merely that he intended the three persons he *did* name to be *included*.

Cline also relies on the disparity between the amount of the settlement, $100,000, and the amount of his damages. In *Hess*, our Supreme Court opined a small settlement of $15,000 for an accident that rendered Hess a paraplegic arguably suggested the release was not intended to cover Ford. (*Hess, supra,* 27 Cal.4th at p. 527.) Cline claims his medical expenses were over $1 million, but he offered no evidence to support this assertion. His attorney testified the potential value of Cline's pain and suffering was in seven figures. This factor was not as strong as in *Hess*, where the settlement was much smaller and the potential defendant (Ford) was a large corporation. Here, the settlement was not *in*significant; it was sufficient to extinguish the Medicare lien. Given the absence of any evidence Rodriguez intended to exclude Homuth from the release, the claimed difference between the settlement and the amount of Cline's damages does not trump the broad language of the release.

The remaining evidence that Cline offers is his testimony and that of his attorney that they did not intend to release Homuth and that Cline would not have signed the release had he understood it to release her. Neither Cline nor his attorney, however,

15

disclosed their subjective intent regarding Homuth and the scope of the release to Rodriguez or anyone else representing Colby or otherwise involved in the release. This evidence of undisclosed subjective intent of Cline and his attorney is insufficient to establish that the parties intended that Homuth be excluded from the release.

In *Neverkovec, supra,* 74 Cal.App.4th 337, in opposition to a summary judgment motion, the plaintiff offered declarations as to the intentions of the parties to the release. She understood the release to apply only to named parties, counsel declared an intention to proceed against an unnamed party, and the insurer's representative declared the settlements were intended to settle all claims against the named parties. The appellate court held that statements revealing only the declarants' undisclosed intent would be insufficient alone to establish a triable issue as to the intent to release third parties. (*Id.* at p. 353.) In *Neverkovec*, however, there was additional evidence, especially the ambiguity of the release itself which included the "curious" repayment provision, sufficient to create a triable issue of material fact. (*Ibid.*) In *Rodriguez, supra,* 212 Cal.App.4th at page 1035, the court found the failure to name a known third party in the release and deposition testimony about the plaintiff's subjective understanding of the release were insufficient to raise a triable issue of fact about the mutual intention of the parties. Here, Cline needed to do more than merely raise a triable issue of fact; he had to overcome Homuth's evidence that the parties intended the release to benefit Homuth as a member of the class of "all other persons." He has failed to do so.

In the alternative, Cline argues there was a mutual mistake as to the scope of the release, as in *Hess*. As we have explained, Cline has failed to show a mistake on the part of Rodriguez, CSAA, or Colby and his parents. The only mistake Cline has shown is the unilateral mistake of Cline and his attorney. Since that mistake was neither known nor suspected by the other parties to the release, it is insufficient to obtain reformation of a

16

contract.  (Civ. Code, § 3399; *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 985.)

## DISPOSITION

The judgment is affirmed.  Homuth shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                               <u>      DUARTE         </u>, J.


We concur:


<u>      NICHOLSON     </u>, Acting P. J.


<u>      HOCH           </u>, J.

DUARTE, J., Concurring.

Although unnecessary to our disposition here, I feel compelled to echo the concerns expressed by my colleagues in other districts regarding the use of "overly broad, loose terms in release agreements." (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 354, quoted in *Hess v. Ford Motor Company* (2002) 27 Cal.4th 516, 530.)

The widespread use of global "all other persons" releases raises policy concerns as to fairness. (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1031.) As we see here, the language of the release may not be given much attention; by signing, a plaintiff (such as Cline) may give up rights he did not mean to give up, with resulting unfortunate consequences. "A stranger to the release may receive a windfall, i.e., an excuse from liability the law would otherwise require him to bear; the plaintiff may be deprived of a recovery to which he would otherwise be entitled, and which is necessary to make him whole; and this loss in turn may force the plaintiff to pursue--and the courts to entertain-- the less certain and more burdensome remedy of a malpractice action against the attorney." (*Id*. at p. 1032.)

As others have written, counsel should "study the language of the release carefully to ascertain whether it may impair claims the plaintiff should reserve for further prosecution" (*Rodriguez v. Oto, supra,* 212 Cal.App.4th at p. 1032) and "advise their clients not to sign releases that appear to bar claims the client does not intend to give up." (*Neverkovec v. Fredericks, supra,* 74 Cal.App.4th at p. 355.)


                                                               DUARTE          , J.

Filed 3/30/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| RONALD LEE CLINE, | C073999 |
| Plaintiff and Appellant, | (Super. Ct. No. CV35615) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| BERNIECE DELORES HOMUTH, | |
| Defendant and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed February 27, 2015, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:

    NICHOLSON    , Acting P. J.


    DUARTE    , J.


    HOCH    , J.

1

EDITORIAL LISTING


APPEAL from a judgment of the Superior Court of Calaveras County, Thomas A. Smith, Judge.  Affirmed.

Hinkle, Jachimowicz, Pointer & Emanuel and Joel P. Waelty for Plaintiff and Appellant.

Mayall Hurley, Vladimir F. Kozina, and Jenny D. Dennis for Defendant and Respondent.