Filed 9/10/24  Seto v. CSAA Insurance Group CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHACUAN SHARON SETO, Individually and as Successor in Interest, etc., et al., <br><br>    Plaintiffs and Appellants, <br><br> v. <br><br> CSAA INSURANCE GROUP et al., <br><br>    Defendants and Respondents. | A166351 & A166573 <br><br><br> (San Francisco County Super. Ct. No. CGC16554402) |

These consolidated appeals[1] arise from an action filed against an insurer and an attorney by several related parties:  Stephen K. Lee (Father), the three eldest of Father's six children, and two family-owned property management companies:  Stephen K. Lee Enterprises (SKLE) and Golden Prosperities Management Company, LLC (GPMC).[2]  Plaintiffs claimed the insurer and attorney engaged in bad faith, malpractice, and other wrongs

---

[1] Plaintiffs filed two notices of appeal:  one from the judgment (A166351), and one from a postjudgment order denying a motion to tax costs (A166573).  We granted a request to consolidate the appeals under docket No. A166351.  Because we reverse the judgment, we vacate the costs order as a matter of course and dismiss the appeal of the motion to tax costs as moot.

[2] Father died while this action was pending.  The trial court accepted the parties' stipulation to substitute his eldest child, Shacuan Sharon Seto—already a plaintiff in her own right—as a plaintiff in her capacity as Father's successor in interest.

1

while defending them in a personal injury action by Marthe Schreiber. Schreiber was a tenant of a property originally developed by Father, jointly owned at the time of the accident by all six of his children, and formerly or presently managed by SKLE and GPMC. Plaintiffs claim the insurer and attorney entered into a partial settlement of the *Schreiber* action over their objection that secured the release of all six Lee siblings and SKLE but left Father and GPMC, whom the insurer did not consider to be covered by its policies, exposed to liability. That ongoing exposure harmed the elder siblings by obliging them to pay for Father's and GPMC's ongoing defense.

The trial court granted summary judgment on three bases: Father and GPMC's exclusion from the settlement did not cause the siblings or GPMC any harm; Father and GPMC were not insureds, so they had no standing to pursue claims against CSAA; and the release included in a family settlement agreement (FSA) concerning various intrafamilial property disputes bars plaintiffs' claims.

We reverse as to all plaintiffs except SKLE, which plaintiffs' complaint alleges is "dissolved," and which is thus unable to file suit. As for the still-existent parties, we conclude that defendants failed to establish as a matter of law that the reference in the release to the "related persons and entities" of the younger siblings includes the insurer and attorney that represented all six siblings in the *Schreiber* action. We further conclude that there are triable factual disputes as to whether the elder siblings' claimed obligation to pay for GPMC's defense amounts to cognizable harm and that, while plaintiffs did not raise a triable dispute as to whether Father or GPMC were insureds under the policies as written, the insurer's motion failed to address plaintiffs' causes of action for policy reformation and negligence by the insurer's captive agent in failing to procure a policy covering Father and

2

GPMC, which could establish standing. We therefore reverse the summary judgments except as to SKLE.

## BACKGROUND

This appeal involves three distinct sets of facts or proceedings: (1) the personal injury action Schreiber filed in 2013 against Father, his six children, GPMC, and SKLE; (2) the 2015 FSA resolving disputes between the six siblings, which contains the release at issue; and (3) this action, filed in 2016 by the three elder siblings (Shacuan Sharon Seto, Gordon Lee, and Patricia Lum), Father, GPMC, and SKLE against David Samuelson and CSAA, the attorney and insurer responsible for representing the siblings and related parties in connection with the partial settlement in the *Schreiber* action.[3] We summarize the relevant aspects of each below.

### I. *The Schreiber Action*

Schreiber's personal injury action led to an appeal decided in 2020 by our colleagues in Division One. (*Schreiber v. Lee* (2020) 47 Cal.App.5th 745 (*Schreiber*).) As that opinion details, Schreiber was seriously injured in 2013 when she fell through a skylight Father had built in her apartment's deck. (*Id.* at p. 748.) Father had originally owned and developed the property but transferred ownership to his six children in the 1980s. (*Id.* at p. 749.) Beginning in the 1980s, SKLE managed the property. (*Id.* at pp. 749–750.) In 2005, GPMC took over that function. (*Ibid.*) GPMC was a member-owned

---

[3] This action involves two policies, one issued by CSAA Fire & Casualty Insurance Company and one by CSAA Insurance Exchange. To defend the *Schreiber* action, CSAA retained Samuelson and his law firm, Bennett, Samuelson, Reynolds, Allard, Cowperthwaite & Gelini PC. No distinction between the CSAA entities, or between Samuelson and his firm, is relevant on appeal. For simplicity, we refer to the insurers collectively as CSAA and the attorney defendants collectively as Samuelson.

management company; Father and the six siblings served as board members, while siblings Gordon and Peter Lee handled day-to-day operations. (*Ibid.*)

As of the filing of Schreiber's initial complaint in September 2013, the property was insured by two CSAA policies: a primary policy with a limit of $1,000,000 that, as written, covered only Peter Lee, but which CSAA agreed was meant to cover all six siblings and SKLE, and an umbrella policy with a limit of $3,000,000 that covered only Peter Lee. Schreiber's initial complaint named Father and SKLE as alleged owners of the property and Peter Lee as its manager.

CSAA retained Samuelson to defend its insureds Peter Lee and SKLE and to provide Father a "courtesy defense." Samuelson induced Schreiber's counsel to file an amended complaint in November 2013 that removed Father as a defendant, given his transfer of the property to his children in the 1980s. The amended complaint added the remaining siblings as defendants in their roles as property owners and corrected pleading errors not relevant here.

In September 2014, Schreiber offered, pursuant to Code of Civil Procedure[4] section 998, to settle the entire action for the $4 million combined limit of the two insurance policies. Two months later, Schreiber filed a second amended complaint (SAC) renaming Father as responsible for the property's design, build, and management and substituted GPMC for a Doe defendant. CSAA agreed to defend all six siblings and SKLE but declined to defend GPMC or to provide a further courtesy defense to Father. Father demanded litigation indemnification from GPMC based on a provision in GPMC's operating agreement.

In July 2015, Schreiber moved for leave to file a third amended complaint (TAC) that was to add allegations that Father and the siblings had

---

[4] All undesignated references are to the Code of Civil Procedure.

failed to insure or capitalize GPMC and ignored its corporate formalities, making it their alter ego.[5]

Schreiber extended the deadline to accept her section 998 offer until September 10, 2015—the date set for a mediation of the case. The elder siblings allege they urged Samuelson to accept the section 998 offer or otherwise arrange a global settlement covering all defendants. But at the mediation held while Schreiber's motion for leave to file the TAC was still pending, Samuelson negotiated a stipulation for partial settlement of the action. Under the stipulation, CSAA would pay Schreiber $2.5 million to release all six siblings and SKLE—i.e., the parties it considered insureds under the primary policy—but not Father and GPMC. After learning of the settlement provided for by the stipulation, the elder siblings opposed its consummation because it excluded Father and GPMC.

In opposing the present motions for summary judgment, plaintiffs submitted evidence that Samuelson entered into the partial settlement stipulation without allowing the elder siblings to be present during the negotiations, and without discussing it with them or providing them a copy until after he signed the partial settlement agreement on their behalf—even though he knew it was inconsistent with the elder siblings' direction to secure a settlement that covered all the named defendants. In addition, despite the imminent deadline for disclosure of experts in the *Schreiber* action, Samuelson negotiated the additional purported agreement of the "settling defendants" "not to share their experts with the non-settling defendants or to disclose the identity of their experts . . . ." This term, agreed to without their

---

[5] We take judicial notice of the trial court docket in the *Schreiber* action, as contained in this court's records for *Schreiber v. Lee* (A149969) solely for the purpose of establishing that Schreiber filed her motion for leave to file a TAC in July 2015, and that it was granted on September 17, 2015.

5

knowledge or consent, required the elder siblings to urgently seek new experts to support Father's and GPMC's defense.

On September 18, 2015, Schreiber filed the TAC adding allegations that GPMC was the Lees' alter ego. On September 30, Samuelson signed a declaration representing a conflict of interest had arisen after the mediation. The conflict, he declared, did not "endanger[] the settlement from being consummated" but precluded his representation of all six siblings. Samuelson further declared CSAA was seeking separate counsel for the elder and younger siblings and, on that basis, requested a continuance of the then-impending trial in the *Schreiber* action.

On October 28, Schreiber and her counsel executed a formal release pursuant to the stipulation for settlement. On October 29, the elder siblings wrote the new attorney retained by CSAA to "communicate that we do not agree with the settlement that [Samuelson] secretly negotiated . . . at the . . . mediation." They noted their concern that the new attorney planned "to proceed with the settlement on behalf of the insurer and against our interests," and asked him to "cease all efforts to move forward with the settlement." On October 30, Samuelson associated new counsel into *Schreiber* to represent the elder and younger siblings but did not substitute out of the case.

At CSAA's direction, in November 2015, the younger siblings' new counsel filed an application for a determination that the partial settlement had been in good faith. (§ 877.6.) Father and GPMC contested the application, which the trial court denied, in part because of the elder siblings' lack of consent to the settlement.

Thereafter, the *Schreiber* action continued to trial against Father and GPMC.[6] The elder siblings, aware of Father's demand for indemnification from GPMC and the TAC's allegations that GPMC was their alter ego, paid for Father's and GPMC's defense. In 2016, a jury awarded Schreiber over $2.6 million in damages against Father and GPMC. It allocated 12 percent of the fault to Schreiber, 54 percent to Father, 16 percent to GPMC, and 18 percent, collectively, to the siblings. By special verdicts, the jury found Father not liable as a director of GPMC but liable as an individual for negligence in building the deck.

After the verdict, Father and GPMC moved to offset the $2.5 million paid in the partial settlement. (*Schreiber*, *supra*, 47 Cal.App.5th at p. 750.) The trial court denied the motion, offset only that portion of the settlement attributable to economic damages, and entered judgment against Father and GPMC for their respective fault-based shares of Schreiber's noneconomic damages. (*Ibid.*) In 2020, Division One affirmed the judgment against Father but held that the settlement entitled GPMC to an offset reducing its liability to $0. (*Id.* at pp. 750, 755–761 [explaining basis for offset].)

## II. *The FSA*

In November 2015—two months after the execution of the partial settlement agreement and six months before the start of the 2016 trial—the six siblings, Father, GPMC, SKLE, and related entities executed the FSA. The FSA is a complicated, multi-part, 17-page agreement that has dozens of clauses concerned primarily with structuring several complex transactions to resolve pending disputes over multiple Lee family properties and trusts, which had an estimated total market value of over $80 million. The disputes

---

[6] Thus, implicitly confirming that the settlement remained in effect as to the six siblings and SKLE.

7

had, over the past decade, split the family into two factions: Group A (as defined in the FSA), which included the elder three siblings, Father, GPMC, and SKLE, and Group B, which included the three younger siblings. Samuelson and CSAA did not participate in the mediation that yielded the FSA, were not involved in its drafting or negotiation, and are not identified by name in the agreement.

The FSA provided for the settlement of 10 civil actions and probate petitions pending between the siblings for partition and other relief regarding jointly owned properties and trusts (the "Subject Actions"). The FSA also provided for the parties to exchange their respective interests in seven family-owned properties (the "Exchange Properties") and other considerations so that each property would be owned fully by Group A or Group B. To achieve that goal, the FSA structured a total of five multi-million-dollar transactions—loans, options, sales, and an Internal Revenue Code section 1031 property exchange—among the parties. The FSA also noted that some parties thereto were also parties to the pending *Schreiber* action, as well as another separate action not relevant to this appeal.

The FSA stated the parties' intent to resolve "all of the disputes, claims, and causes of action between them including any facts that were or could have been alleged in any of the Actions and Petitions referenced . . . above," including "any matter arising out of the . . . construction, . . . ownership, operation, management, repair and/or maintenance of any property formerly owned by any member of Group A, Group B, or any combination thereof . . . (the 'Released Matters')."

The FSA included a mutual general release pursuant to Civil Code section 1542. Each member of Group A released "each and every member of Group B, and his, her, or its Related Persons or Entities, from any and all

past, present, and future Claims whether asserted or not asserted in the Subject Actions, whether known or unknown, . . . that arise out of, relate to, or have any connection whatsoever with the Released Matters, the LLCs, the Exchange Property, . . . and all matters that were raised, or could have been raised, in the Subject Actions." Group B similarly released Group A and its "Related Persons or Entities."

As defined, "Related Persons or Entities" included "insurers" and "attorneys" of both individual and business-entity parties to the FSA. The FSA defined "Claims" to include "any and all allegations of breach of contract, . . . breach of covenant of good faith and fair dealing, any other form of contractual liability, any common law . . . [action for] breach of fiduciary duty, breach of trust, negligence, . . . [or] any other form of tort liability."

### III. *The Present Action*

In September 2016—10 months after executing the FSA and one month after the *Schreiber* jury verdict—plaintiffs, who are all members of Group A, filed this action against CSAA and Samuelson. Plaintiffs asserted causes of action against Samuelson for breach of fiduciary duty and malpractice and against CSAA for breach of contract and of the covenant of good faith and fair dealing, negligence, reformation of the policies to insure Father and GPMC, and a declaration of plaintiffs' right to coverage for the *Schreiber* action. Plaintiffs claimed CSAA and Samuelson's failure to include Father and GPMC in the *Schreiber* settlement left Father and GPMC exposed to liability, which damaged the siblings by forcing them to pay for Father's and GPMC's defense. Plaintiffs also alleged Samuelson signed the *Schreiber* settlement stipulation on their behalf despite knowing it was inconsistent with their express instructions, failed to promptly declare a conflict of interest arising from his representation of all six siblings despite their different settlement

9

positions, and sought to finalize the settlement without the elder siblings' consent and over their express objections.

In 2017, the trial court stayed this action pending resolution of the *Schreiber* appeal. In 2021 the court lifted the stay, and Samuelson and CSAA moved for summary judgment or adjudication on three primary bases, which applied to differing sets of plaintiffs. Each defendant sought summary judgment as to all plaintiffs based on the release in the FSA, on the theory that plaintiffs, as members of Group A, released CSAA and Samuelson as "Related Persons or Entities" of Group B (i.e., the younger siblings). Each defendant sought summary judgment as to the three elder siblings on the basis that Father's and GPMC's exclusion from the *Schreiber* settlement did not cause the siblings any economic harm cognizable as damages. Finally, CSAA sought summary judgment against Father and GPMC on the ground that they were not insureds and thus have no standing to pursue claims against CSAA.[7] (The latter two grounds were complementary: In CSAA's view, Father and GPMC may have suffered damages, but they were not insureds, while the elder siblings were insureds, but did not suffer damages.) The court granted the motions on all three primary bases, resulting in summary judgments in favor of all defendants against all plaintiffs.

## DISCUSSION

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A defendant seeking summary

---

[7] As discussed below, CSAA also sought summary judgment as to certain plaintiffs and summary adjudication of certain claims on grounds the trial court did not reach.

judgment bears an initial burden of producing evidence to show, as to each cause of action, that the plaintiff cannot establish an element thereof or contest a complete defense thereto. (§ 437c, subd. (p)(2).) "Summary judgment law in this state . . . require[s] a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar*, at p. 854, fn. omitted.) If a defendant makes that prima facie showing, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists" as to the cause of action or defense. (§ 437c, subd. (p)(2).) To bear that burden, a plaintiff must set forth "specific facts showing that a triable issue of material fact exists." (*Ibid*.) We review a summary judgment de novo. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) We decide independently whether, viewing the evidence in the light most favorable to the nonmoving party, "the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Ibid*.; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

### 1. Defendants Have Not Established the Release Unambiguously Applies to Claims Against the Siblings' Joint Insurer and Attorney

The trial court's one basis for granting summary judgment in favor of both defendants against all plaintiffs was that the release in the FSA barred the claims. In so holding, the court relied on three passages in the FSA—the release, the clause defining "related persons or entities" to include "insurers" and "attorneys," and a provision stating the parties had agreed to an allocation of potential liabilities in the *Schreiber* action. Neither defendant offered any supporting extrinsic evidence of the meaning of the release or the negotiation of the FSA, in which they played no part.

11

On appeal, the parties dispute the effect of defendants' lack of extrinsic evidence. Plaintiffs quote dicta in *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 349 (*Neverkovec*) suggesting that a defendant seeking summary judgment as a third party beneficiary of a release cannot make a prima facie showing based solely on the text of the release that identifies a class of persons or entities that includes the defendant. *Neverkovec* suggests a defendant must offer extrinsic evidence of the release's circumstances and negotiation to show the parties truly intended to release any defendant satisfying the definition of the class of released entities. (*Ibid.*) Defendants counter by citing *Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020 (*Rodriguez*), which rejects *Neverkovec*'s dicta and holds that a defendant can make a prima facie showing based solely on the text of a release naming a category of entities that unambiguously includes the defendant. (*Rodriguez*, at p. 1031.)

We need not resolve that dispute. The language of the release, read in context, does not unambiguously apply to claims brought by Group A against CSAA and Samuelson in their roles as insurer and attorney for Group A—as compared to in their capacity representing Group B. This ambiguity means that under both *Neverkovec* and *Rodriguez*, defendants' exclusive reliance on the text of the release was insufficient to make a prima facie showing. This conclusion requires reversal of the summary judgment.

Releases " 'are governed by the generally applicable law of contracts.' " (*Rodriguez*, *supra*, 212 Cal.App.4th at p. 1029, quoting *Neverkovec*, *supra*, 74 Cal.App.4th at p. 348.) Whether a third party like CSAA or Samuelson can raise a release as a defense depends on whether the contracting parties intended to benefit a class of persons including that third party. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 (*Hess*).) "Ascertaining this intent is a question of ordinary contract interpretation." (*Ibid.*) To answer it, we

12

interpret the contract "to give effect to the mutual intention of the parties as it existed at the time of contracting." (Civ. Code, § 1636.) That intent "is to be ascertained from the writing alone, if possible" (*id.*, § 1639), but a contract "may be explained by reference to the circumstances under which it was made, and the matter to which it relates" (*id.*, § 1647). "However broad may be the terms of a contract, it extends only to those things which it appears that the parties intended to contract" (*id.*, §1648). (See *Hess*, at p. 524, quoting Civ. Code, §§ 1636, 1639, 1647, 1648.)

The release states that each member of Group A, which includes each plaintiff here, releases each "member of Group B and his, her, or its Related Persons or Entities" from all "past, present, and future Claims . . . ." The release similarly states the converse: each member of Group B releases each "member of Group A and his, her, or its Related Persons or Entities." The FSA defines "Related Persons or Entities" to include the "insurers" and "attorneys" of any member of Group A or Group B. Assuming for argument's sake that plaintiffs' claims have some "connection . . . with the Released Matters [or] . . . the Exchange Property," and fall within the FSA's definition of "Claims,"[8] the dispositive question is whether Samuelson and CSAA's "relation to" Group B means they are protected from claims by Group A based

---

[8] The FSA defines "Released Matters" as those "arising out of the . . . construction, . . . ownership, . . . management, [etc.] of any property formerly owned by any member of Group A, Group B, or any combination thereof." That includes 71 Water Street, San Francisco, where Schreiber lived and which the siblings owned. The FSA also defines "Exchange Properties" to include that property.

The FSA defines "Claims" by type of claim, to include claims for "breach of contract, . . . breach of fiduciary duty, . . . negligence, . . . [and] any other form of tort liability," and by subject matter, to include claims related to "defective design and/or defective construction . . . in any of the Exchange Properties," e.g., the defective skylight in 71 Water Street.

on alleged breaches of duties arising out of their "relation to" Group A. In other words, the FSA unambiguously releases two types of claims: (1) those brought by Group A against Group B and its related entities, and (2) those brought by Group B against Group A and its related entities. But nothing about the text of these releases suggests that they are releasing claims by Group A against *their own* related entities or claims by Group B against *their own* related entities.

Here, CSAA and Samuelson were the insurer and attorney in *Schreiber* for all six siblings—i.e., for members of Group A *and* Group B. Defendants rely on that joint representation to support their argument that the "Group A releases Group B" aspect of the FSA means that plaintiff members of Group A cannot bring any claims against CSAA and Samuelson. But this argument ignores the dynamics of the claims: Group A members are bringing the action against defendants in their capacity representing Group A, *not* Group B. The text of the FSA does not appear to encompass such a release.

The circumstances in which the FSA was negotiated further undermine defendants' view that a reasonable person in the younger siblings' position would have understood the language of the release to apply to the elder siblings' claims against Samuelson and CSAA. The siblings drafted and reached agreement on the FSA in October or November 2015, weeks after the *Schreiber* mediation at which, plaintiffs allege, Samuelson engaged in acts that furthered the interests of CSAA by seriously breaching his duty of loyalty to plaintiffs.[9] Samuelson's alleged conduct included signing a

---

[9] Whether Samuelson and CSAA breached duties owed to the elder siblings is of course disputed; the undisputed facts surrounding the FSA's negotiation are the occurrence of the mediation in the *Schreiber* action, the

14

settlement on plaintiffs' behalf without their consent—a settlement that barred him from disclosing to his own clients the names of experts he had retained for them in the impending *Schreiber* trial, so that plaintiffs had to urgently seek new experts to testify on behalf of their family-owned business and father. Between the September 10, 2015 *Schreiber* mediation and the execution of the FSA in November 2015, Samuelson declared a conflict in his representation of plaintiffs, yet maintained that the settlement entered into contrary to their prior instructions should be consummated over their express objections, even as the trial court gave Schreiber leave to amend her complaint to allege that GPMC was the siblings' alter ego, thereby re-exposing the siblings to personal liability.

Plaintiffs' evidence of the circumstances of the FSA's negotiation permits an inference that, as the siblings finalized the FSA, which included separate reference to the *Schreiber* action, they were keenly, freshly aware of plaintiffs' potential claims against Samuelson and CSAA such that, had plaintiffs agreed to release their claims against Samuelson and CSAA in the FSA, the parties would have drafted the release to explicitly say so. On defendants' view, plaintiffs, as members of Group A, instead conveyed an intent to dismiss serious misconduct claims against their *own* attorney and insurer solely by agreeing to release Group B's "Related Persons or Entities." Yet defendants contend plaintiffs did so in a mediation in which Samuelson and CSAA played no part and which had the primary purpose of structuring a complex series of financial transactions to resolve intrafamilial property disputes. (See *Vahle v. Barwick* (2001) 93 Cal.App.4th 1323, 1329 [reversing summary judgment based on release in part because "it strikes us as unusual

_____

content of the partial settlement, and the elder siblings' objections to Samuelson's and CSAA's conduct in that regard.

15

that a personal injury settlement would include a release of an attorney malpractice claim. One would expect to see explicit language regarding such a release"].)

Given the parties' failure to name Samuelson and CSAA in the release, despite plaintiffs' known potential claims against them, we cannot agree that its language, read in light of its circumstances, applies unambiguously to those claims. (See, e.g., *Vahle v. Barwick, supra*, 93 Cal.App.4th at p. 1329 [holding " 'all other persons' " in release was ambiguous in light of failure to expressly name party's former attorney, who was subject to known potential malpractice claim]; *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 556 [finding " 'all persons' " ambiguous because, had parties intended release to apply to other driver in accident, who was a named defendant, he "could have been specifically named in . . . the release"].)

Because the text of the release is ambiguous and defendants offered no extrinsic evidence of its negotiation, defendants did not make a prima facie showing of entitlement to summary judgment. (See *Rodriguez, supra*, 212 Cal.App.4th at p. 1031 ["If a contract expressly and *unambiguously* grants rights to a class including the person now seeking to enforce it, proof of the contract makes out the third party's threshold case," italics added]; *Neverkovec, supra*, 74 Cal.App.4th at p. 349 [third party seeking summary judgment based on release must show parties intended to release him, which usually requires extrinsic evidence of intent].)

## 2. There Is a Triable Factual Dispute Whether GPMC's Exclusion From the Settlement Caused the Elder Siblings Economic Harm

The trial court also granted summary judgment in favor of both defendants, as to the three sibling plaintiffs, on the basis that the exclusion of Father and GPMC from the partial settlement did not cause those plaintiffs any economic harm cognizable as damages. The court noted that the siblings

16

themselves did not end up owing Schreiber money—either directly or by way of imputed liability for GPMC's negligence—after GPMC secured an offset reducing its liability to $0, which left only Father liable to Schreiber. (*Schreiber*, *supra*, 47 Cal.App.5th at p. 750.) The court further relied on evidence that the elder siblings had not paid any money directly to Father or GPMC and were not personally obliged to indemnify Father under the indemnification clause in GPMC's operating agreement.

The trial court nonetheless erred in granting summary judgment against the elder siblings because it did not address plaintiffs' evidence that, after Schreiber amended her complaint to allege that GPMC was the siblings' alter ego, the elder siblings incurred out-of-pocket costs to pay for GPMC's defense and thus avoid potential personal liability. Defendants contend that the elder siblings' decision to pay for GPMC's and Father's defense was gratuitous, not an economic cost imposed by GPMC's and Father's exclusion from the settlement. As to Father, we agree that the elder siblings have cited no evidence giving rise to a triable factual dispute as to whether they owed a legal, as opposed to filial, obligation to indemnify him. But as to GPMC, defendants are mistaken. They have not explained why, let alone proven beyond triable factual dispute that, the costs incurred by the elder siblings to ensure the defense of a company claimed to be their alter ego did not constitute economic costs due to GPMC's exclusion from the partial settlement.[10]

Defendants assert on appeal that plaintiffs have admitted they paid nothing as a result of the *Schreiber* action, but defendants cite only Sharon

_____

[10] In finding there is a triable factual dispute as to damages, we express no opinion as to whether or not such expenses were covered by the policy or are noninsurable as a matter of public policy, which were not arguments raised before the trial court or on appeal.

17

Seto's deposition testimony that she did not pay any money *to Father's trust*, and Gordon Lee's deposition testimony that he did not recall personally making out-of-pocket payments related to the *Schreiber* action. But two attorneys—each of whom represented all three elder siblings, Father, and GPMC—declared that the elder siblings incurred expenses to retain their law firm to represent Father and GPMC in *Schreiber* after the partial settlement, as well as expenses for expert witnesses and an appeal bond in *Schreiber*.[11] At minimum, there is thus a triable factual dispute whether the elder siblings incurred such expenses. The summary judgment cannot be affirmed on the basis of a lack of economic harm to the elder siblings.

### 3. CSAA Did Not Show an Entitlement to Judgment Against Father and GPMC on the Basis That They Were Not Insureds

The trial court granted summary judgment for CSAA, as to the claims of Father and GPMC, on the basis that those two plaintiffs were not named insureds on either policy at issue and thus lacked "standing" to sue CSAA. But in so ruling, the court failed to address the cause of action alleging CSAA's vicarious liability for failing to ensure coverage for all "owners or their management companies and their respective partners and/or members" and the cause of action seeking reformation of the policies to name Father

---

[11] CSAA objected to portions of the attorneys' declarations on several grounds, including hearsay and lack of personal knowledge. Because the trial court did not rule on these objections, CSAA correctly notes that they are preserved for appeal. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 516–517, 534.) But CSAA has not made any argument on appeal that the trial court erred in not sustaining its objections as to the relevant parts of the declarations. Preserving an issue *for* appeal is not the same as showing error *on* appeal, thus the trial court's failure to rule on CSAA's objections requires us to presume the objections were overruled and the evidence admitted. (*Id.* at p. 534.)

and GPMC as insureds. The summary judgment in favor of CSAA as to Father and GPMC was thus erroneous.[12]

The trial court's failure to address the reformation and negligence causes of action is unsurprising given CSAA's failure to submit related evidence in support of judgment. While CSAA's notice of motion stated that "[Father] and [GPMC] cannot establish prima facie . . . causes of action or claims against [CSAA] because they are not insureds under the two insurance policies," and "[t]here is nothing to indicate or even suggest the requisite mistake for policy reformation" (capitalization removed), CSAA submitted no evidence to substantiate its assertion.

In its memorandum of points and authorities, CSAA addressed the reformation cause of action in an unsupported single-sentence argument: "Nor is there anything to show or even suggest that a mistake had somehow been made by some person at some point in time to add [Father] or GPMC to the policies or to otherwise make a prima facie claim for policy reformation." CSAA did not address the negligence cause of action at all. Nor did CSAA set forth as an undisputed material fact that plaintiffs had failed, in response to discovery requests, to identify evidence supporting their reformation or negligence claims. A defendant cannot secure summary adjudication merely

_____

[12] Nor can we direct a summary adjudication of Father's and GPMC's other causes of action against CSAA: The only basis for the ruling as to all causes of action was Father and GPMC's asserted lack of standing as insureds; if the reformation and/or negligence causes of action succeed, that bar will vanish. As this court held 45 years ago, "the negligent omission of an intended insured on a policy . . . is the basis for a cause of action by the intended insured who, foreseeably, has been damaged by the omission"; such a party can state a cause of action "for both negligence and reformation." (*Jackson v. Aetna Life & Casualty Co.* (1979) 93 Cal.App.3d 838, 840, 847–848; see also *American Surety Co. of New York v. Heise* (1955) 136 Cal.App.2d 689, 696.)

19

by asserting a lack of evidence. (*Aguilar*, *supra*, 25 Cal.4th at p. 854 [defendant moving for summary judgment must "present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence"].) Thus, the trial court lacked authority to grant summary adjudication as to those causes of action—or, as a result, to grant summary judgment in CSAA's favor as to Father and GPMC.

Plaintiffs further contend that granting summary judgment for CSAA as to Father on the basis that he was not an insured was error for an additional reason. It is undisputed that, at the outset of the *Schreiber* action, CSAA provided Father a "courtesy defense," which resulted in Father's omission from the FAC. But Schreiber renamed Father in the SAC, at which point CSAA declined to defend him. Citing *Mosier v. Southern California Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022 (*Mosier*), plaintiffs contend that once an insurer undertakes to provide a "courtesy defense," it owes the courteously defended party the same duties as an insured. CSAA attempts to distinguish *Mosier* on its facts, noting the benefit to Father of the initial dismissal and asserting, "That Schreiber later re-named him as defendant in a *different capacity* as a builder/developer rather than as an owner (like the actual insureds) does not obligate CSAA . . . to defend the non-insured for every new, different claim that may be pled against him."

But CSAA cites no authority for this proposition, and *Mosier* remains unhelpful, as it involved alleged misconduct *during* a courtesy defense, not the *discontinuance* of such a defense. (*Mosier*, *supra*, 63 Cal.App.4th at pp. 1028–1037.) It is axiomatic that the party moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) That principle obliged CSAA to cite authority

20

establishing as a matter of law that it was entitled to terminate Father's courtesy defense in the manner it did. CSAA's failure to do so is an independent reason why the summary judgment in its favor as against Father must be reversed.

### 4. CSAA's Alternative Arguments Justify Affirmance Only of the Summary Judgment as to SKLE, Which Is Dissolved

CSAA also defends the summary judgment—either in whole or as to certain claims or parties—by reiterating arguments that it raised below, but the trial court did not reach.[13] The only one with merit is that the judgment should be affirmed as against SKLE, the partnership, which is dissolved and thus lacks standing to sue. (*J.C. Peacock, Inc. v. Hasko* (1960) 184 Cal.App.2d 142, 151–152 ["an action brought in the name of a nonexistent plaintiff, natural or artificial, is a nullity"].) CSAA notes that the introductory part of plaintiffs' own complaint identifying the parties in this action states that SKLE "was a general partnership, now dissolved, engaged in the business of leasing and managing [71 Water Street]." Plaintiffs' reply brief does not dispute that point, so plaintiffs have implicitly conceded it. (*Campbell v. Ingram* (1918) 37 Cal.App. 728, 732 [if appellant "has not deigned to reply" to respondent's argument, we may assume appellant deems it "unanswerable"].)

---

[13] On appeal, CSAA also makes two arguments not made below: that plaintiffs' insurance bad faith cause of action fails because there was a genuine dispute as to coverage, while their negligence cause of action fails because negligence is "not a cognizable legal theory against an insurer in a bad faith action." But CSAA has not explained why we should consider these new theories for the first time on appeal. We will do so only if a new theory raises a pure legal question that "could not be altered by the presentation of additional evidence." (*In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 511.)

The other alternative arguments fail. The first is that "res judicata"—by which CSAA evidently means issue preclusion[14]—bars plaintiffs' causes of action. CSAA contends plaintiffs have litigated "(1) all their respective liabilities to Schreiber, (2) the scope of liability of Father . . . and (3) their liabilities with respect to each other," so there is no basis for their claims that they have "suffered economic harm due to any conduct by [CSAA]" or "are exposed to potential indemnification claims by Father." But the *Schreiber* opinion determined only the defendants' liabilities *to Schreiber*, including their vicarious or imputed liability for the fault of others, and how those issues affected the offsets to which Father and GPMC were entitled. (*Schreiber*, *supra,* 47 Cal.App.5th at pp. 750–751, 758–761.) CSAA and Samuelson were not parties to *Schreiber*, and the parties to that action did not assert cross-claims. The duties and liabilities of the *Schreiber* defendants *to one another* were thus not at issue. As a result, the dispositive issues in this action were not "actually litigated and necessarily decided" in *Schreiber* (*DKN Holdings LLC v. Faerber*, *supra*, 61 Cal.4th at p. 825), including whether the policies at issue should be reformed to cover Father or GPMC;

---

[14] Claim preclusion, formerly known as res judicata, " 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them' "; it applies "if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) Claim preclusion is plainly inapplicable here, as defendants do not claim to have been parties to or in privity with any party to the *Schreiber* action. Issue preclusion, formerly known as collateral estoppel, "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." (*DKN Holdings LLC*, at p. 824.) It applies "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at p. 825.)

whether the partial settlement in *Schreiber* caused the elder siblings economic harm by compelling them to pay for GPMC's defense, and whether the release in the FSA applies to plaintiffs' claims here.

CSAA also contends it is entitled to summary adjudication of plaintiffs' claim for punitive damages (§ 437c, subd. (f)(1)) because plaintiffs cannot recover actual damages and their causes of action all fail. Moreover, CSAA argues that plaintiffs failed to demonstrate a triable dispute as to their ability to prove, by clear and convincing evidence, that CSAA engaged in fraud, oppression, or malice. But CSAA's motion did not raise or offer evidence to support of these arguments. Nor has CSAA developed an argument on appeal as to why, if plaintiffs' allegations are proven—including that CSAA representatives participated with Samuelson in negotiating a settlement without their insureds' knowledge, participation, or consent— CSAA could not be found liable for punitive damages.

## DISPOSITION

The summary judgments in favor of all defendants against plaintiffs Shacuan Sharon Seto, individually and as successor in interest to decedent Stephen K. Lee, Gordon Lee, Patricia Lum, and Golden Prosperities Management Company are reversed. The summary judgments in favor of all defendants against plaintiff Stephen K. Lee Enterprises are affirmed. The order denying plaintiffs' motion to tax costs is vacated. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

23

_____
DESAUTELS, J.

We concur:

_____
RICHMAN, ACTING P.J.

_____
MILLER, J.

*Seto, Individually and as Successor in Interest, etc., et al. v. CSAA et al.*
(A166351 & A166573)